# LEATHERS, COMMISSIONER OF REVENUES OF ARKANSAS *v.* MEDLOCK ET AL.

No. 90–29.   Argued January 9, 1991—Decided April 16, 1991*

---

*Together with No. 90–38, *Medlock et al.* v. *Leathers, Commissioner of Revenues of Arkansas, et al.*, also on certiorari to the same court.

440

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, SCALIA, KENNEDY, and SOUTER, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 454.

*William E. Keadle* argued the cause for petitioner in No. 90–29 and respondents in No. 90–38. With him on the briefs was *Larry D. Vaught.*

*Eugene G. Sayre* argued the cause and filed briefs for petitioners in No. 90–38 and respondents in No. 90–29.†

JUSTICE O'CONNOR delivered the opinion of the Court.

These consolidated cases require us to consider the constitutionality of a state sales tax that excludes or exempts certain segments of the media but not others.

I

Arkansas' Gross Receipts Act imposes a 4% tax on receipts from the sale of all tangible personal property and specified services. Ark. Code Ann. §§ 26–52–301, 26–52–302 (1987 and Supp. 1989). The Act exempts from the tax certain sales of goods and services. § 26–52–401 (Supp. 1989). Counties

---

†Briefs of *amici curiae* urging reversal were filed for Dow Jones & Co., Inc., by *Richard J. Tofel* and *Robert D. Sack;* for the Indiana Cable Television Association Inc. by *D. Craig Martin;* and for the National Cable Television Association, Inc., by *H. Bartow Farr III, Richard G. Taranto, Brenda L. Fox,* and *Michael S. Schooler.*

Briefs of *amici curiae* urging affirmance were filed for the City of Los Angeles, California, et al., by *Larrine S. Holbrooke, William R. Malone, Edward J. Perez,* and *Barry A. Lindahl;* and for the City of New York et al. by *Robert Alan Garrett.*

Briefs of *amici curiae* were filed for Cablevision Industries Corp. et al. by *Brent N. Rushforth;* for the California Cable Television Association by *Frank W. Lloyd III, Diane B. Burstein,* and *Alan J. Gardner;* for Century Communications Corp. et al. by *John P. Cole, Jr.,* and *Wesley R. Heppler;* for the Competitive Cable Association et al. by *Harold R. Farrow, Sol Schildhause,* and *Robert M. Bramson;* for Greater Media Cablevision, Inc., by *Robert H. Louis* and *Salvatore M. DeBunda;* and for the National Association of Broadcasters et al. by *Jack N. Goodman* and *James J. Popham.*

within Arkansas impose a 1% tax on all goods and services subject to taxation under the Gross Receipts Act, §§ 26–74–307, 26–74–222 (1987 and Supp. 1989), and cities may impose a further ½% or 1% tax on these items, § 26–75–307 (1987).

The Gross Receipts Act expressly exempts receipts from subscription and over-the-counter newspaper sales and subscription magazine sales. See §§ 26–52–401(4), (14) (Supp. 1989); Revenue Policy Statement 1988–1 (Mar. 10, 1988), reprinted in CCH Ark. Tax Rep. ¶ 69–415. Before 1987, the Act did not list among those services subject to the sales tax either cable television[1] or scrambled satellite broadcast television services to home dish-antennae owners.[2] See § 26–52–301 (1987). In 1987, Arkansas adopted Act 188, which amended the Gross Receipts Act to impose the sales tax on cable television. 1987 Ark. Gen. Acts, No. 188, § 1.

Daniel L. Medlock, a cable television subscriber, Community Communications Co., a cable television operator, and the Arkansas Cable Television Association, Inc., a trade organization composed of approximately 80 cable operators with systems throughout the State (cable petitioners), brought this class action in the Arkansas Chancery Court to challenge the extension of the sales tax to cable television services. Cable petitioners contended that their expressive activities are protected by the First Amendment and are comparable to those of newspapers, magazines, and scrambled satellite broadcast television. They argued that Arkansas' sales tax-

---

[1] Cable systems receive television, radio, or other signals through antennae located at their so-called "headends." Information gathered in this way, as well as any other material that the system operator wishes to transmit, is then conducted through cables strung over utility poles and through underground conduits to subscribers. See generally D. Brenner, M. Price, & M. Meyerson, Cable Television and Other Nonbroadcast Video: Law and Policy § 1.03 (1989).

[2] Satellite television broadcast services transmit over-the-air "scrambled" signals directly to the satellite dishes of subscribers, who must pay for the right to view the signals. See generally A. Easton & S. Easton, The Complete Sourcebook of Home Satellite TV 57–66 (1988).

ation of cable services, and exemption or exclusion from the tax of newspapers, magazines, and satellite broadcast services, violated their constitutional rights under the First Amendment and under the Equal Protection Clause of the Fourteenth Amendment.

The Chancery Court granted cable petitioners' motion for a preliminary injunction, requiring Arkansas to place in escrow the challenged sales taxes and to keep records identifying collections of the taxes. Both sides introduced extensive testimony and documentary evidence at the hearing on this motion and at the subsequent trial. Following the trial, the Chancery Court concluded that cable television's necessary use of public rights-of-way distinguishes it for constitutional purposes from other media. It therefore upheld the constitutionality of Act 188, dissolved its preliminary injunction, and ordered all funds collected in escrow released.

In 1989, shortly after the Chancery Court issued its decision, Arkansas adopted Act 769, which extended the sales tax to "all other distribution of television, video or radio services with or without the use of wires provided to subscribers or paying customers or users." 1989 Ark. Gen. Acts, No. 769, § 1. On appeal to the Arkansas Supreme Court, cable petitioners again challenged the State's sales tax on the ground that, notwithstanding Act 769, it continued unconstitutionally to discriminate against cable television. The Supreme Court rejected the claim that the tax was invalid after the passage of Act 769, holding that the Constitution does not prohibit the differential taxation of different media. *Medlock* v. *Pledger*, 301 Ark. 483, 487, 785 S. W. 2d 202, 204 (1990). The court believed, however, that the First Amendment prohibits discriminatory taxation among members of the same medium. On the record before it, the court found that cable television services and satellite broadcast services to home dish-antennae owners were "substantially the same." *Ibid.* The State Supreme Court rejected the Chancery Court's conclusion that cable television's use of public

rights-of-way justified its differential sales tax treatment, explaining that cable operators already paid franchise fees for that right. *Id.*, at 485, 785 S. W. 2d, at 203. It therefore held that Arkansas' sales tax was unconstitutional under the First Amendment for the period during which cable television, but not satellite broadcast services, were subject to the tax. *Id.*, at 487; 785 S. W. 2d, at 204.

Both cable petitioners and the Arkansas Commissioner of Revenues petitioned this Court for certiorari. We consolidated these petitions and granted certiorari, *Pledger* v. *Medlock*, 498 U. S. 809 (1990), in order to resolve the question, left open in *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 233 (1987), whether the First Amendment prevents a State from imposing its sales tax on only selected segments of the media.

## II

Cable television provides to its subscribers news, information, and entertainment. It is engaged in "speech" under the First Amendment, and is, in much of its operation, part of the "press." See *Los Angeles* v. *Preferred Communications, Inc.*, 476 U. S. 488, 494 (1986). That it is taxed differently from other media does not by itself, however, raise First Amendment concerns. Our cases have held that a tax that discriminates among speakers is constitutionally suspect only in certain circumstances.

In *Grosjean* v. *American Press Co.*, 297 U. S. 233 (1936), the Court considered a First Amendment challenge to a Louisiana law that singled out publications with weekly circulations above 20,000 for a 2% tax on gross receipts from advertising. The tax fell exclusively on 13 newspapers. Four other daily newspapers and 120 weekly newspapers with weekly circulations of less than 20,000 were not taxed. The Court discussed at length the pre-First Amendment English and American tradition of taxes imposed exclusively on the press. This invidious form of censorship was intended to curtail the circulation of newspapers and thereby prevent the

people from acquiring knowledge of government activities. *Id.*, at 246–251. The Court held that the tax at issue in *Grosjean* was of this type and was therefore unconstitutional. *Id.*, at 250.

In *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 ·U. S. 575 (1983), we noted that it was unclear whether the result in *Grosjean* depended on our perception in that case that the State had imposed the tax with the intent to penalize a selected group of newspapers or whether the structure of the tax was sufficient to invalidate it. See 460 U. S., at 580 (citing cases and commentary). *Minneapolis Star* resolved any doubts about whether direct evidence of improper censorial motive is required in order to invalidate a differential tax on First Amendment grounds: "Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Id.*, at 592.

At issue in *Minneapolis Star* was a Minnesota special use tax on the cost of paper and ink consumed in the production of publications. The tax exempted the first $100,000 worth of paper and ink consumed annually. Eleven publishers, producing only 14 of the State's 388 paid circulation newspapers, incurred liability under the tax in its first year of operation. The Minneapolis Star & Tribune Co. (Star Tribune) was responsible for roughly two-thirds of the total revenue raised by the tax. The following year, 13 publishers, producing only 16 of the State's 374 paid circulation papers, paid the tax. Again, the Star Tribune bore roughly two-thirds of the tax's burden. We found no evidence of impermissible legislative motive in the case apart from the structure of the tax itself.

We nevertheless held the Minnesota tax unconstitutional for two reasons. First, the tax singled out the press for special treatment. We noted that the general applicability of any burdensome tax law helps to ensure that it will be met with widespread opposition. When such a law applies only to a single constituency, however, it is insulated from this po-

litical constraint. See *id.*, at 585. Given "the basic assumption of our political system that the press will often serve as an important restraint on government," we feared that the threat of exclusive taxation of the press could operate "as effectively as a censor to check critical comment." *Ibid.* "Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment," that it is presumptively unconstitutional. *Ibid.*

Beyond singling out the press, the Minnesota tax targeted a small group of newspapers—those so large that they remained subject to the tax despite its exemption for the first $100,000 of ink and paper consumed annually. The tax thus resembled a penalty for certain newspapers. Once again, the scheme appeared to have such potential for abuse that we concluded that it violated the First Amendment: "[W]hen the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Id.*, at 592.

*Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221 (1987), reaffirmed the rule that selective taxation of the press through the narrow targeting of individual members offends the First Amendment. In that case, Arkansas Writers' Project sought a refund of state taxes it had paid on sales of the Arkansas Times, a general interest magazine, under Arkansas' Gross Receipts Act of 1941. Exempt from the sales tax were receipts from sales of religious, professional, trade and sports magazines. See *id.*, at 224–226. We held that Arkansas' magazine exemption, which meant that only "a few Arkansas magazines pay any sales tax," operated in much the same way as did the $100,000 exemption in *Minneapolis Star* and therefore suffered from the same type of discrimination identified in that case. *Id.*, at 229. Moreover, the basis on which the tax differentiated among magazines depended entirely on their content. *Ibid.*

These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. See *Grosjean*, 297 U. S., at 244–249; *Minneapolis Star*, 460 U. S., at 585. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. See *id.*, at 575; *Arkansas Writers'*, 481 U. S., at 229. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech. See *id.*, at 229–231.

The Arkansas tax at issue here presents none of these types of discrimination. The Arkansas sales tax is a tax of general applicability. It applies to receipts from the sale of all tangible personal property and a broad range of services, unless within a group of specific exemptions. Among the services on which the tax is imposed are natural gas, electricity, water, ice, and steam utility services; telephone, telecommunications, and telegraph service; the furnishing of rooms by hotels, apartment hotels, lodging houses, and tourist camps; alteration, addition, cleaning, refinishing, replacement, and repair services; printing of all kinds; tickets for admission to places of amusement or athletic, entertainment, or recreational events; and fees for the privilege of having access to, or use of, amusement, entertainment, athletic, or recreational facilities. See Ark. Code Ann. § 26–52–301 (Supp. 1989). The tax does not single out the press and does not therefore threaten to hinder the press as a watchdog of government activity. Cf. *Minneapolis Star, supra*, at 585. We have said repeatedly that a State may impose on the press a generally applicable tax. See *Jimmy Swaggart Min-*

*istries* v. *Board of Equalization of Cal.*, 493 U. S. 378, 387–388 (1990); *Arkansas Writers', supra,* at 229; *Minneapolis Star, supra,* at 586, and n. 9.

Furthermore, there is no indication in these cases that Arkansas has targeted cable television in a purposeful attempt to interfere with its First Amendment activities. Nor is the tax one that is structured so as to raise suspicion that it was intended to do so. Unlike the taxes involved in *Grosjean* and *Minneapolis Star,* the Arkansas tax has not selected a narrow group to bear fully the burden of the tax.

The tax is also structurally dissimilar to the tax involved in *Arkansas Writers'.* In that case, only "a few" Arkansas magazines paid the State's sales tax. See *Arkansas Writers',* 481 U. S., at 229, and n. 4. Arkansas Writers' Project maintained before the Court that the Arkansas Times was the only Arkansas publication that paid sales tax. The Commissioner contended that two additional periodicals also paid the tax. We responded that, "[w]hether there are three Arkansas magazines paying tax or only one, the burden of the tax clearly falls on a limited group of publishers." *Id.,* at 229, n. 4. In contrast, Act 188 extended Arkansas' sales tax uniformly to the approximately 100 cable systems then operating in the State. See App. to Pet. for Cert. in No. 90–38, p. 12a. While none of the seven scrambled satellite broadcast services then available in Arkansas, Tr. 12 (Aug. 19, 1987), was taxed until Act 769 became effective, Arkansas' extension of its sales tax to cable television hardly resembles a "penalty for a few." See *Minneapolis Star, supra,* at 592; *Arkansas Writers', supra,* at 229, and n. 4.

The danger from a tax scheme that targets a small number of speakers is the danger of censorship; a tax on a small number of speakers runs the risk of affecting only a limited range of views. The risk is similar to that from content-based regulation: It will distort the market for ideas. "The constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion,

putting the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen* v. *California*, 403 U. S. 15, 24 (1971). There is no comparable danger from a tax on the services provided by a large number of cable operators offering a wide variety of programming throughout the State. That the Arkansas Supreme Court found cable and satellite television to be the same medium does not change this conclusion. Even if we accept this finding, the fact remains that the tax affected approximately 100 suppliers of cable television services. This is not a tax structure that resembles a penalty for particular speakers or particular ideas.

Finally, Arkansas' sales tax is not content based. There is nothing in the language of the statute that refers to the content of mass media communications. Moreover, the record establishes that cable television offers subscribers a variety of programming that presents a mixture of news, information, and entertainment. It contains no evidence, nor is it contended, that this material differs systematically in its message from that communicated by satellite broadcast programming, newspapers, or magazines.

Because the Arkansas sales tax presents none of the First Amendment difficulties that have led us to strike down differential taxation in the past, cable petitioners can prevail only if the Arkansas tax scheme presents "an additional basis" for concluding that the State has violated petitioners' First Amendment rights. See *Arkansas Writers'*, *supra*, at 233. Petitioners argue that such a basis exists here: Arkansas' tax discriminates among media and, if the Arkansas Supreme Court's conclusion regarding cable and satellite television is accepted, discriminated for a time within a medium. Petitioners argue that such intermedia and intramedia discrimination, even in the absence of any evidence of intent to suppress speech or of any effect on the expression of particu-

lar ideas, violates the First Amendment. Our cases do not support such a rule.

*Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540 (1983), stands for the proposition that a tax scheme that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas. In that case, we considered provisions of the Internal Revenue Code that discriminated between contributions to lobbying organizations. One section of the Code conferred tax-exempt status on certain nonprofit organizations that did not engage in lobbying activities. Contributions to those organizations were deductible. Another section of the Code conferred tax-exempt status on certain other nonprofit organizations that did lobby, but contributions to them were not deductible. Taxpayers contributing to veterans' organizations were, however, permitted to deduct their contributions regardless of those organizations' lobbying activities.

The tax distinction between these lobbying organizations did not trigger heightened scrutiny under the First Amendment. *Id.*, at 546–551. We explained that a legislature is not required to subsidize First Amendment rights through a tax exemption or tax deduction.[3] *Id.*, at 546. For this proposition, we relied on *Cammarano* v. *United States*, 358 U. S. 498 (1959). In *Cammarano*, the Court considered an Internal Revenue regulation that denied a tax deduction for money spent by businesses on publicity programs directed at pending state legislation. The Court held that the regulation did not violate the First Amendment because it did not discriminate on the basis of who was spending the money on

---

[3] Certain *amici* in support of cable petitioners argue that *Regan* is distinguishable from these cases because the petitioners in *Regan* were complaining that their contributions to lobbying organizations should be tax *deductible*, while cable petitioners complain that sales of their services should be tax *exempt*. This is a distinction without a difference. As we explained in *Regan*, "[b]oth tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system." 461 U. S., at 544.

publicity or what the person or business was advocating. The regulation was therefore "plainly not '"aimed at the suppression of dangerous ideas."'" *Id.*, at 513, quoting *Speiser* v. *Randall*, 357 U. S. 513, 519 (1958).

*Regan*, while similar to *Cammarano*, presented the additional fact that Congress had chosen to exempt from taxes contributions to veterans' organizations, while not exempting other contributions. This did not change the analysis. Inherent in the power to tax is the power to discriminate in taxation. "Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes." *Regan*, *supra*, at 547. See also *Madden* v. *Kentucky*, 309 U. S. 83, 87–88 (1940); *New York Rapid Transit Corp.* v. *City of New York*, 303 U. S. 573, 578 (1938); *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 294 (1898).

*Cammarano* established that the government need not exempt speech from a generally applicable tax. *Regan* established that a tax scheme does not become suspect simply because it exempts only some speech. *Regan* reiterated in the First Amendment context the strong presumption in favor of duly enacted taxation schemes. In so doing, the Court quoted the rule announced more than 40 years earlier in *Madden*, an equal protection case:

> "'The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. . . . [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court can-

not have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.'" *Madden, supra,* at 87–88 (footnotes omitted), quoted in *Regan,* 461 U. S., at 547–548.

On the record in *Regan,* there appeared no such "hostile and oppressive discrimination." We explained that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas." *Id.,* at 548 (internal quotation marks omitted). But that was not the case. The exemption for contributions to veterans' organizations applied without reference to the content of the speech involved; it was not intended to suppress any ideas; and there was no demonstration that it had that effect. *Ibid.* Under these circumstances, the selection of the veterans' organizations for a tax preference was "obviously a matter of policy and discretion." *Id.,* at 549 (internal quotation marks omitted).

That a differential burden on speakers is insufficient by itself to raise First Amendment concerns is evident as well from *Mabee* v. *White Plains Publishing Co.,* 327 U. S. 178 (1946), and *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186 (1946). Those cases do not involve taxation, but they do involve government action that places differential burdens on members of the press. The Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.,* applies generally to newspapers as to other businesses, but it exempts from its requirements certain small papers. § 213(a)(8). Publishers of larger daily newspapers argued that the differential burden thereby placed on them violates the First Amendment. The Court upheld the exemption because there was no indication that the government had singled out the press for special treatment, *Walling, supra,* at 194, or that the exemption was a "'deliberate and

calculated device'" to penalize a certain group of newspapers, *Mabee, supra,* at 184, quoting *Grosjean,* 297 U. S., at 250.

Taken together, *Regan, Mabee,* and *Oklahoma Press* establish that differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas. That was the case in *Grosjean, Minneapolis Star,* and *Arkansas Writers',* but it is not the case here. The Arkansas Legislature has chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment.

Before the Arkansas Chancery Court, cable petitioners contended that the State's tax distinction between cable and other media violated the Equal Protection Clause of the Fourteenth Amendment as well as the First Amendment. App. to Pet. for Cert. in No. 90–38, p. 21a. The Chancery Court rejected both claims, and cable petitioners challenged these holdings before the Arkansas Supreme Court. That court did not reach the equal protection question as to the State's temporary tax distinction between cable and satellite services because it disallowed that distinction on First Amendment grounds. We leave it to the Arkansas Supreme Court to address this question on remand.

For the foregoing reasons, the judgment of the Arkansas Supreme Court is affirmed in part and reversed in part, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN joins, dissenting.

This Court has long recognized that the freedom of the press prohibits government from using the tax power to discriminate against individual members of the media or against the media as a whole. See *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575 (1983); *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221 (1987). The Framers of the First Amendment, we have explained, specifically intended to prevent government from using disparate tax burdens to impair the untrammeled dissemination of information. We granted certiorari in this case to consider whether the obligation not to discriminate against individual members of the press prohibits the State from taxing one information medium—cable television—more heavily than others. The majority's answer to this question—that the State is free to discriminate between otherwise like-situated media so long as the more heavily taxed medium is not too "small" in number—is no answer at all, for it fails to explain which media actors are entitled to equal tax treatment. Indeed, the majority so adamantly proclaims the irrelevance of this problem that its analysis calls into question whether any general obligation to treat media actors evenhandedly survives today's decision. Because I believe the majority has unwisely cut back on the principles that inform our selective-taxation precedents, and because I believe that the First Amendment prohibits the State from singling out a particular information medium for heavier tax burdens than are borne by like-situated media, I dissent.

I

A

Our decisions on selective taxation establish a nondiscrimination principle for like-situated members of the press. Under this principle, "differential treatment, unless justified

by some special characteristic of the press, . . . is presumptively unconstitutional," and must be struck down "unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Minneapolis Star, supra,* at 585.

The nondiscrimination principle is an instance of government's general First Amendment obligation not to interfere with the press as an institution. As the Court explained in *Grosjean,* the purpose of the Free Press Clause "was to preserve an untrammeled press as a vital source of public information." 297 U. S., at 250. Reviewing both the historical abuses associated with England's infamous "'taxes on knowledge'" and the debates surrounding ratification of the Constitution, see *id.,* at 246–250; *Minneapolis Star,* 460 U. S., at 583–586, and nn. 6–7, our decisions have recognized that the Framers viewed selective taxation as a distinctively potent "means of abridging the freedom of the press," *id.,* at 586, n. 7.

We previously have applied the nondiscrimination principle in two contexts. First, we have held that this principle prohibits the State from imposing on the media tax burdens not borne by like-situated nonmedia enterprises. Thus, in *Minneapolis Star,* we struck down a use tax that applied to the ink and paper used in newspaper production but not to any other item used as a component of a good to be sold at retail. See *id.,* at 578, 581–582. Second, we have held that the nondiscrimination principle prohibits the State from taxing *individual* members of the press unequally. Thus, as an alternative ground in *Minneapolis Star,* we concluded that the State's use tax violated the First Amendment because it exempted the first $100,000 worth of ink and paper consumed and thus effectively singled out large publishers for a disproportionate tax burden. See *id.,* at 591–592. Similarly, in *Arkansas Writers' Project,* we concluded that selective exemptions for certain periodicals rendered unconstitutional the application of a general sales tax to the remaining

periodicals "because [the tax] [was] not evenly applied to *all* magazines." See 481 U. S., at 229 (emphasis added); see also *Grosjean* v. *American Press Co.*, *supra* (tax applied only to newspapers that meet circulation threshold unconstitutionally discriminates against more widely circulated newspapers).

Before today, however, we had not addressed whether the nondiscrimination principle prohibits the State from singling out a particular information medium for tax burdens not borne by other media. *Grosjean* and *Minneapolis Star* both invalidated tax schemes that discriminated between different members of a single medium, namely, newspapers. Similarly, *Arkansas Writers' Project* invalidated a general sales tax because it "treat[ed] some magazines less favorably than others," 481 U. S., at 229, leaving open the question whether less favorable tax treatment of magazines than of newspapers furnished an additional ground for invalidating the scheme, see *id.*, at 233. This case squarely presents the question whether the State may discriminate between distinct information media, for under Arkansas' general sales tax scheme, cable operators pay a sales tax on their subscription fees that is not paid by newspaper or magazine companies on their subscription fees or by television or radio broadcasters on their advertising revenues.[1] In my view, the principles

---

[1] Subject to various exemptions, Arkansas law imposes a 4% tax on the receipts from sales of all tangible personal property and of specified services. Ark. Code Ann. §§ 26–52–301, 26–52–302, 26–52–401 (1987 and Supp. 1989). Cable television service is expressly included in the tax. See § 26–52–301(3)(D)(i) (Supp. 1989). Proceeds from the sale of newspapers, § 26–52–401(4) (Supp. 1989), and from the sale of magazines by subscription, § 26–52–401(14) (Supp. 1989); Revenue Policy Statement 1988–1 (Mar. 10, 1988), reprinted in CCH Ark. Tax Rep. ¶ 69–415, are expressly exempted, as are the proceeds from the sale of advertising in newspapers and other publications, § 26–52–401(13) (Supp. 1989). Proceeds from the

that animate our selective-taxation cases clearly condemn this form of discrimination.

## B

Although cable television transmits information by distinctive means, the *information service* provided by cable does not differ significantly from the information services provided by Arkansas' newspapers, magazines, television broadcasters, and radio stations. This Court has recognized that cable operators exercise the same core press function of "communication of ideas as do the traditional enterprises of newspaper and book publishers, public speakers, and pamphleteers," *Los Angeles* v. *Preferred Communications, Inc.*, 476 U. S. 488, 494 (1986), and that "[c]able operators now share with broadcasters a significant amount of editorial discretion regarding what their programming will include," *FCC* v. *Midwest Video Corp.*, 440 U. S. 689, 707 (1979). See also *ante*, at 444 (acknowledging that cable television is "part of the 'press'"). In addition, the cable-service providers in this case put on extensive and unrebutted proof at trial designed to show that consumers regard the news, sports, and entertainment features provided by cable as largely interchangeable with the services provided by other members of the

---

sale of advertising for broadcast radio and television services are not included in the tax.

Insofar as the Arkansas Supreme Court found that cable and scrambled satellite television are a *single* medium, 301 Ark. 483, 487, 785 S. W. 2d 202, 204–205 (1990), this case also involves a straightforward application of *Arkansas Writers' Project* and *Minneapolis Star* in resolving the cable operators' constitutional challenge to the taxes that they paid prior to 1989, the year in which Arkansas amended its sales tax to include the subscription fees collected by scrambled-satellite television. I would affirm on that basis the Arkansas Supreme Court's conclusion that the pre-1989 version of the Arkansas sales tax violated the First Amendment by imposing on cable a tax burden not borne by its scrambled-satellite television.

print and electronic media. See App. 81–85, 100–101, 108, 115, 133–137, 165–170. See generally *Competition, Rate Deregulation and the Commission's Policies Relating to Provision of Cable Television Service*, 5 FCC Record 4962, 4967 (1990) (discussing competition between cable and other forms of television).

Because cable competes with members of the print and electronic media in the larger information market, the power to discriminate between these media triggers the central concern underlying the nondiscrimination principle: the risk of covert censorship. The nondiscrimination principle protects the press from censorship prophylactically, condemning any selective-taxation scheme that presents the "*potential* for abuse" by the State, *Minneapolis Star*, 460 U. S., at 592 (emphasis added), independent of any actual "evidence of an improper censorial motive," *Arkansas Writers' Project, supra*, at 228; see *Minneapolis Star, supra*, at 592 ("Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment"). The power to discriminate among likesituated media presents such a risk. By imposing tax burdens that disadvantage one information medium relative to another, the State can favor those media that it likes and punish those that it dislikes.

Inflicting a competitive disadvantage on a disfavored medium violates the First Amendment "command that the government . . . shall not impede the free flow of ideas." *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945). We have previously recognized that differential taxation *within* an information medium distorts the marketplace of ideas by imposing on some speakers costs not borne by their competitors. See *Grosjean*, 297 U. S., at 241, 244–245 (noting competitive disadvantage arising from differential tax based on newspaper circulation). Differential taxation *across* different media likewise "limit[s] the circulation of information to which the public is entitled," *id.*, at 250, where, as here, the

relevant media compete in the same information market. By taxing cable television more heavily relative to its social cost than newspapers, magazines, broadcast television and radio, Arkansas distorts consumer preferences for particular information formats, and thereby impairs "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press* v. *United States, supra,* at 20.

Because the power selectively to tax cable operators triggers the concerns that underlie the nondiscrimination principle, the State bears the burden of demonstrating that "differential treatment" of cable television is justified by some "special characteristic" of that particular information medium or by some other "counterbalancing interest of compelling importance that [the State] cannot achieve without differential taxation." *Minneapolis Star, supra,* at 585 (footnote omitted). The State has failed to make such a showing in this case. As the Arkansas Supreme Court found, the amount collected from the cable operators pursuant to the state sales tax does not correspond to any social cost peculiar to cable-television service, see 301 Ark. 483, 485, 785 S. W. 2d 202, 203 (1990); indeed, cable operators in Arkansas must pay a franchise fee expressly designed to defray the cost associated with cable's unique exploitation of public rights of way. See *ibid.* The only justification that the State asserts for taxing cable operators more heavily than newspapers, magazines, television broadcasters and radio stations is its interest in raising revenue. See Brief for Respondents in No. 90–38, p. 9. This interest is not sufficiently compelling to overcome the presumption of unconstitutionality under the nondiscrimination principle. See *Arkansas Writers' Project,* 481 U. S., at 231–232; *Minneapolis Star, supra,* at 586.[2]

---

[2] I need not consider what, if any, state interests might justify selective taxation of cable television, since the State has advanced no interest other than revenue enhancement. I also do not dispute that the unique characteristics of cable may justify special regulatory treatment of that medium. See *Los Angeles* v. *Preferred Communications, Inc.,* 476 U. S. 488, 496

## II

The majority is undisturbed by Arkansas' discriminatory tax regime. According to the majority, the power to single out cable for heavier tax burdens presents no realistic threat of governmental abuse. The majority also dismisses the notion that the State has any general obligation to treat members of the press evenhandedly. Neither of these conclusions is supportable.

### A

The majority dismisses the risk of governmental abuse under the Arkansas tax scheme on the ground that the number of media actors exposed to the tax is "large." *Ante*, at 449. According to the majority, where a tax is generally applicable to nonmedia enterprises, the selective application of that tax to different segments of the media offends the First Amendment only if the tax is limited to "a small number of speakers," *ante*, at 448, for it is only under those circumstances that selective taxation "resembles a penalty for particular speakers or particular ideas," *ante*, at 449. The selective sales tax at issue in *Arkansas Writers' Project*, the majority points out, applied to no more than three magazines. See *ante*, at 448. The tax at issue here, "[i]n contrast," applies "uniformly to the approximately *100* cable systems" in operation in Arkansas. *Ibid.* (emphasis added). In my view, this analysis is overly simplistic and is unresponsive to the concerns that inform our selective-taxation precedents.

To start, the majority's approach provides no meaningful guidance on the intermedia scope of the nondiscrimination principle. From the majority's discussion, we can infer that three is a sufficiently "small" number of affected actors to

(1986) (BLACKMUN, J., concurring); cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 386–401 (1969). I conclude only that the State is not free to burden cable with a selective tax absent a clear nexus between the tax and a "special characteristic" of cable television service or a "counterbalancing interest of compelling importance." *Minneapolis Star*, 460 U. S., at 585.

trigger First Amendment problems and that one hundred is too "large" to do so. But the majority fails to pinpoint the magic number *between* three and one hundred actors above which discriminatory taxation can be accomplished with impunity. Would the result in this case be different if Arkansas had only 50 cable-service providers? Or 25? The suggestion that the First Amendment prohibits selective taxation that "resembles a penalty" is no more helpful. A test that turns on whether a selective tax "penalizes" a particular medium presupposes some baseline establishing that medium's entitlement to equality of treatment with other media. The majority never develops any theory of the State's obligation to treat like-situated media equally, except to say that the State must avoid discriminating against too "small" a number of media actors.

In addition, the majority's focus on absolute numbers fails to reflect the concerns that inform the nondiscrimination principle. The theory underlying the majority's "small versus large" test is that "a tax on the services provided by a large number of cable operators offering a wide variety of programming throughout the State," *ante*, at 449, poses no "risk of affecting only a limited range of views," *ante*, at 448. This assumption is unfounded. The record in this case furnishes ample support for the conclusion that the State's cable operators make unique contributions to the information market. See, *e. g.*, App. 82 (testimony of cable operator that he offers "certain religious programming" that "people demand . . . because they otherwise could not have access to it"); *id.*, at 138 (cable offers Spanish-language information network); *id.*, at 150 (cable broadcast of local city council meetings). The majority offers no reason to believe that programs like these are duplicated by other media. Thus, to the extent that selective taxation makes it harder for Arkansas' 100 cable operators to compete with Arkansas' 500 newspapers, magazines, and broadcast television and radio stations, see 1 Gale Directory of Publications and Broadcast Media 67–68

(123d ed. 1991), Arkansas' discriminatory tax *does* "risk . . . affecting only a limited range of views," and may well "distort the market for ideas" in a manner akin to direct "content-based regulation." *Ante*, at 448.[3]

The majority also mistakenly assesses the impact of Arkansas' discriminatory tax as if the State's 100 cable operators comprised 100 additional actors in a *statewide* information market. In fact, most communities are serviced by only a single cable operator. See generally 1 Gale Directory, *supra*, at 69–91. Thus, in any given locale, Arkansas' discriminatory tax may disadvantage a *single* actor, a "small" number even under the majority's calculus.

Even more important, the majority's focus on absolute numbers ignores the potential for abuse inherent in the State's power to discriminate based on *medium identity*. So long as the disproportionately taxed medium is sufficiently "large," nothing in the majority's test prevents the State from singling out a particular medium for higher taxes, either because the State does not like the character of the services that the medium provides or because the State simply wishes to confer an advantage upon the medium's competitors.

Indeed, the facts of this case highlight the potential for governmental abuse inherent in the power to discriminate among like-situated media based on their identities. Before this litigation began, most receipts generated by the media— including newspaper sales, certain magazine subscription fees, print and electronic media advertising revenues, and cable television and scrambled-satellite television subscription fees—were either expressly exempted from, or not expressly included in, the Arkansas sales tax. See Ark. Code

---

[3] Even if it did happen to apply neutrally across the range of viewpoints expressed in the Arkansas information market, Arkansas' discriminatory tax would still raise First Amendment problems. "It hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him." *Regan* v. *Taxation with Representation of Washington*, 461 U. S. 540, 553 (1983) (BLACKMUN, J., concurring).

Ann. §§ 84–1903, 84–1904(f), (j), (1947 and Supp. 1985); see also *Arkansas Writers' Project*, 481 U. S., at 224–225. Effective July 1, 1987, however, the legislature expanded the tax base to include cable television subscription fees. See App. to Pet. for Cert. in No. 90–38, p. 16a. Cable operators then filed this suit, protesting the discriminatory treatment in general and the absence of any tax on scrambled-satellite television—cable's closest rival—in particular. While the case was pending on appeal to the Arkansas Supreme Court, the Arkansas legislature again amended the sales tax, this time extending the tax to the subscription fees paid for scrambled-satellite television. 301 Ark., at 484, 785 S. W. 2d, at 203. Of course, for all we know, the legislature's initial decision selectively to tax cable may have been prompted by a similar plea from traditional broadcast media to curtail competition from the emerging cable industry. If the legislature did indeed respond to such importunings, the tax would implicate government censorship as surely as if the government itself disapproved of the new competitors.

As I have noted, however, our precedents do not require "evidence of an improper censorial motive," *Arkansas Writers' Project*, *supra*, at 228, before we may find that a discriminatory tax violates the Free Press Clause; it is enough that the application of a tax offers the *"potential* for abuse," *Minneapolis Star*, 460 U. S., at 592 (emphasis added). That potential is surely present when the legislature may, at will, include or exclude various media sectors from a general tax.

## B

The majority, however, does not flinch at the prospect of intermedia discrimination. Purporting to draw on *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983)—a decision dealing with the tax-deductibility of lobbying expenditures—the majority embraces "the proposition that a tax scheme that discriminates among speakers does not implicate the First Amendment unless it discriminates *on*

*the basis of ideas." Ante*, at 450 (emphasis added). "[T]he power to discriminate in taxation," the majority insists, is "[i]nherent in the power to tax." *Ante*, at 451.

Read for all they are worth, these propositions would essentially annihilate the nondiscrimination principle, at least as it applies to tax differentials between individual members of the press. If *Minneapolis Star*, *Arkansas Writers' Project*, and *Grosjean* stand for anything, it is that the "power to tax" does *not* include "the power to discriminate" when the press is involved. Nor is it the case under these decisions that a tax regime that singles out individual members of the press implicates the First Amendment *only* when it is "directed at, or presents the danger of suppressing, *particular* ideas." *Ante*, at 453 (emphasis added). Even when structured in a manner that is content neutral, a scheme that imposes differential burdens on like-situated members of the press violates the First Amendment because it poses *the risk* that the State might abuse this power. See *Minneapolis Star, supra*, at 592.

At a minimum, the majority incorrectly conflates our cases on selective taxation of the press and our cases on the selective taxation (or subsidization) of speech generally. *Regan* holds that the government does not invariably violate the Free Speech Clause when it selectively subsidizes one group of speakers according to content-neutral criteria. This power, when exercised with appropriate restraint, inheres in government's legitimate authority to tap the energy of expressive activity to promote the public welfare. See *Buckley* v. *Valeo*, 424 U. S. 1, 90–97 (1976).

But our cases on the selective taxation of the *press* strike a different posture. Although the Free Press Clause does not guarantee the press a preferred position over other speakers, the Free Press Clause does "protec[t] [members of press] from invidious discrimination." L. Tribe, American Constitutional Law § 12–20, p. 963 (2d ed. 1988). Selective taxation is precisely that. In light of the Framers' specific in-

tent "to preserve an untrammeled press as a vital source of public information," *Grosjean*, 297 U. S., at 250; see *Minneapolis Star*, *supra*, at 585, n. 7, our precedents recognize that the Free Press Clause imposes a special obligation on government to avoid disrupting the integrity of the information market. As Justice Stewart explained:

> "[T]he Free Press guarantee is, in essence, a *structural* provision of the Constitution. Most of the other provisions in the Bill of Rights protect specific liberties or specific rights of individuals: freedom of speech, freedom of worship, the right to counsel, the privilege against compulsory self-incrimination, to name a few. In contrast, the Free Press Clause extends protection to an institution." Stewart, "Or of the Press," 26 Hastings L. J. 631, 633 (1975) (emphasis in original).

Because they distort the competitive forces that animate this institution, tax differentials that fail to correspond to the social cost associated with different information media, and that are justified by nothing more than the State's desire for revenue, violate government's obligation of evenhandedness. Clearly, this is true of disproportionate taxation of cable television. Under the First Amendment, government simply has no business interfering with the process by which citizens' preferences for information formats evolve.[4]

---

[4] The majority's reliance on *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178 (1946), and *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186 (1946), is also misplaced. At issue in those cases was a provision that exempted small newspapers with primarily local distribution from the Fair Labor Standards Act of 1938 (FLSA). In upholding the provision, the Court noted that the exemption promoted a legitimate interest in placing the exempted papers "on a parity with other small town enterprises" that also were not subject to regulation under the FLSA. *Mabee, supra,* at 184; see also *Oklahoma Press, supra,* at 194. In *Minneapolis Star,* we distinguished these cases on the ground that, unlike the FLSA exemption, Minnesota's discrimination between large and small newspapers did not derive from, or correspond to, any *general* state policy to benefit small businesses. See 460 U. S., at 592, and n. 16. Similarly, Arkansas' dis-

Today's decision unwisely discards these teachings. I dissent.

---

crimination against cable operators derives not from any general, legitimate state policy unrelated to speech but rather from the simple decision of state officials to treat one information medium differently from all others. Thus, like the schemes in *Arkansas Writers' Project* and *Minneapolis Star*, but unlike the scheme at issue in *Mabee* and *Oklahoma Press*, the Arkansas tax scheme must be supported by a compelling interest to survive First Amendment scrutiny. Cf. *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968).