195 F.3d 47 (D.C. Cir. 1999)
 American Society of Association Executives, Appellant
v.
United States of America, Appellee
 No. 98-5563
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 6, 1999
Decided November 9, 1999
 
 Appeal from the United States District Court for the District of Columbia(No. 95cv00918)
 Nory Miller argued the cause for appellant. With her on the briefs were Bruce J. Ennis, Jr., and Jerald A. Jacobs.
 Steven W. Parks, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General, Kenneth L. Greene, Attorney, and Wilma A. Lewis, U.S. Attorney. Thomas J. Clark, Attorney, U.S. Department of Justice, entered an appearance.
 Before: Edwards, Chief Judge, Wald and Williams, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Williams.
 Williams, Circuit Judge:
 
 
 1
 Before its amendment by the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66 (the "1993 Act" or the "Act"), 162(e) of the Internal Revenue Code ("I.R.C.") allowed businesses to deduct their direct lobbying expenditures as business expenses. In the 1993 Act, Congress amended I.R.C. 162(e) so that lobbying expenses would no longer be deductible. 26 U.S.C. 162(e) (1994). It also enacted several additional provisions to ensure that taxpayers could not evade the force of the Act by paying dues to tax-exempt organizations that would then conduct the desired lobbying activities. The American Society of Association Executives, a tax-exempt trade association that lobbies on behalf of its members, filed suit, alleging that these provisions placed an affirmative burden on its right to lobby, in violation of the First Amendment. The district court rejected the constitutional challenge and granted the government's motion for summary judgment; we affirm.
 
 
 2
 * * *
 
 
 3
 Under the 1993 Act, a tax-exempt organization that engages in lobbying activities and is funded in part by membership dues and other contributions may either pay a tax on its lobbying activities (the so-called "proxy tax"), or may follow "flow-through provisions" aimed at making sure no contributor or dues payer takes a deduction with respect to funds used for lobbying. 26 U.S.C. 6033(e) (1994).
 
 
 4
 The proxy tax, if the tax-exempt organization chooses that route, falls on all lobbying expenses as defined in 162(e)(1) and is imposed at the highest marginal rate of the corporate income tax under I.R.C. 11, now 35%. Id. 6033(e)(2)(A)(ii). If the organization chooses the flowthrough alternative, it is required to provide donors, at the time of "assessment or payment" of dues or other contributions, with a "reasonable estimate" of the portion of the dues or contributions that is allocable to 162(e)(1) expenditures. Id. 6033(e)(1)(A)(ii). Donors are not allowed to take a deduction for the portion of their dues and contributions allocable to such expenditures. Id. 162(e)(3).
 
 
 5
 To prevent organizations from circumventing the purpose of the flow-through provisions by artificially allocating their dues to non-lobbying activities, Congress enacted an "allocation provision." Id. 6033(e)(1)(C)(i). This provision dictates that lobbying expenditures will be considered paid out of membership dues or "other similar amounts" to the extent that they exist. Id. So as to preclude the analogous manipulation across years (e.g., an organization might "prepay" lobbying expenses in excess of dues in one year and reduce its lobbying expenses below that received from dues in the following years, thereby artificially increasing the deductions for which its members are eligible), a "carryover" provision dictates that any lobbying expenditures in excess of the dues or other amounts paid to the organization in one year will be treated as expenditures incurred during the following year and payable out of dues received during that year. Id. 6033(e)(1)(C)(ii).
 
 
 6
 The organization must include on its annual tax returns the lobbying expenditures that it has incurred as well as the total amount of dues "to which such expenditures are allocable."Id. 6033(e)(1)(A)(i). If a tax-exempt organization trying to follow the flow-through method in fact incurs lobbying expenditures in excess of the aggregate amount covered as nondeductible by its notices to dues payers for the year, the discrepancy will be subject to the flat 35% tax. Id. 6033(e)(2)(A). The Secretary may (but evidently need not) "waive" this tax if the organization agrees to correct its mistaken estimate by "carrying over" the excess to the following year and allocating it to dues paid in that year. Id. 6033(e)(2)(B).
 
 
 7
 The American Society of Association Executives is a nonprofit professional association that lobbies on behalf of about 23,000 association executives and staff members. It is tax exempt under 26 U.S.C. 501(c)(6), as a "[b]usiness league[ ] ... not organized for profit." Thus it is subject to the lobbying tax provisions at issue in this case.
 
 
 8
 For its fiscal year ending June 30, 1994, the Society chose to apply the "proxy tax" to its lobbying expenditures, thus allowing its members and contributors full deductibility. On November 7, 1994 it submitted an amended tax return, requesting a refund of the $56,900 paid as proxy tax, and claiming that the tax scheme was unconstitutional. After six months passed without action on the refund claim by the Internal Revenue Service, the Society brought suit in district court. It alleged that the scheme placed a burden on its freedom of expression in violation of the First Amendment, and that it discriminated against lobbying associations and in favor of individual businesses and private persons, in contravention of the Fifth Amendment.
 
 
 9
 The district court granted the government's motion for summary judgment, rejecting both the Society's claims. See American Soc'y of Ass'n Executives v. United States, 23 F. Supp.2d 64 (D.D.C. 1998). On appeal, the Society argues only its First Amendment theory.
 
 
 10
 * * *
 
 
 11
 The Society and the government agree on certain general principles. Although the government has no obligation to subsidize speech, see, e.g., Perry v. Sindermann, 408 U.S. 593, 597 (1972), the courts will subject to "strict scrutiny" any affirmative burden that the government places on speech on the basis of its content. See, e.g., Leathers v. Medlock, 499 U.S. 439, 447 (1991). The Society points to various effects of the proxy and flow-through choices that in its view affirmatively burden lobbying.
 
 
 12
 First, at least for association members in relatively low brackets, the flat 35% rate necessarily places a higher effective burden on lobbying through an association than the generally applicable corporate tax--a graduated rate starting at 15% and capped at 35%--places on direct lobbying. The government counters (in part) that a dues payer in the 35% bracket, and even well below, can get more lobbying per pretax dollar by contributing to a lobbying association than by doing its own lobbying. This is because the dues payer gets a deduction for its full contribution to the entity, including the amount devoted to the tax payment itself. Whereas a dues payer can buy $100 worth of lobbying for $135 (i.e., $100 plus the $35 proxy tax), a corporation that is taxed at a 35% rate would have to use up $154 of pre-tax income in order to spend $100 on lobbying (65% of $154 = $100).[1] The Society contests these calculations, but we need not resolve the dispute, partly because the government figures would still leave dues payers in tax brackets lower than the effective rate of the proxy tax (brackets lower than 26% by the government's calculations) more burdened by the proxy tax than by the treatment of direct lobbying. An additional reason we need not resolve it is that, as we shall see, associations like the Society have an option that avoids any such possible burden.
 
 
 13
 Alternatively, argues the Society, the flow-through method subjects lobbying to a risk of non-neutral treatment. If an association overestimates its lobbying expenses, its dues payers will forfeit part of their deduction for nonlobbying business activities, without the possibility of recovering this deduction in the future. And if it underestimates lobbying expenditures, it is exposed to the proxy tax, from which it can escape only if the Secretary chooses to "waive" the tax and allow "carryover" treatment. The Secretary has failed to adopt regulations setting forth clear sufficient conditions for the waiver. According to the Society, his only official statement on the subject consists of instructions for Form 990 (the income tax return for associations), in which he says that he may permit a waiver if the association's estimate was reasonable and the association agrees to add the excess to the following year's amount. See IRS Form 990, line 85h and Instructions (1998). The Society argues that, in light of the First Amendment right to lobby, the Secretary's discretion is far too broad to survive strict scrutiny.
 
 
 14
 Finally, the Society says that the allocation rules, by treating the association's lobbying expenditures as funded by dues or similar payments (to the extent available), regardless of their actual source, in effect limit the deductions that members can take for dues that the association spends on ordinary business activities. This, it says, violates the principle that the government may not condition the receipt of an otherwise available benefit on an entity's refraining from the exercise of its freedom of speech. See Perry, 408 U.S. at 597.
 
 
 15
 We do not reach these arguments, however, because a tax exempt organization that engages in lobbying activities can altogether sidestep the specified dilemmas. A 501(c)(6) association can avoid any alleged burden on its First Amendment rights by splitting itself into two 501(c)(6) organizations--one that engages exclusively in lobbying on behalf of its members and one that completely refrains from lobbying. Whereas the lobbying wing can be funded by dues and contributions, for which members will not be able to take a deduction, the non-lobbying affiliate can be funded, at least in part, by deductible dues. This system achieves precisely what the Society says the Constitution demands: a generally applicable tax system that, although it does not subsidize lobbying, imposes no burden on it by comparison with other activities.
 
 
 16
 If this option is available, the treatment of lobbying contested here is subject only to "rational basis" scrutiny, and, as we shall see, handily survives. In Regan v. Taxation With Representation, 461 U.S. 540 (1983), the Supreme Court considered the operation of I.R.C. §§ 170(c)(2), 501(c)(3) and 501(c)(4). Sections 501(c)(3) and (4) define the characteristics of certain tax-exempt organizations, the key difference (for our purposes) being that "no substantial part of the activities" of a 501(c)(3) organization may consist of lobbying, whereas no such limit applies to 501(c)(4) organizations. The trade off is that 170(c)(2) permits taxpayers to deduct any contributions made to 501(c)(3) organizations, but not to organizations that are tax-exempt under 501(c)(4). Because the plaintiff organization in Taxation With Representation could conduct its lobbying activities through a 501(c)(4) affiliate, and continue to receive deductible contributions as a 501(c)(3) organization, the Court applied rational basis review and upheld the statute. See Taxation With Representation, 461 U.S. at 547; see also Rust v. Sullivan, 500 U.S. 173, 196-98 (1991) (upholding Congress's subsidy of family planning services even though the funding could not be used for abortion-related activities, on the basis that the grantee could still conduct such activities through programs that were "separate and independent" from those receiving federal funds). In contrast with the situation in Taxation With Representation, the Court in FCC v. League of Women Voters, 468 U.S. 364 (1984), invalidated a grant conditioned on a broadcasting station's not "engag[ing] in editorializing," on the basis that the station could not "segregate its activities according to the source of its funding." Id. at 400-01.[2]
 
 
 17
 In Taxation With Representation the Court noted that the taxpayer organization must show that its 501(c)(3) wing does not subsidize its 501(c)(4) affiliate, so as to ensure that "no tax-deductible contributions are used to pay for substantial lobbying." 461 U.S. at 544 & n.6, 103 S.Ct. 1997.The Court found, however, that the IRS's only requirements to that end--that the two organizations be "separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying"--were not "unduly burdensome." Id. at 545 n.6; see also id. at 553 (Blackmun, J., concurring) (stating that "[a]s long as the IRS goes no further than this," the plaintiff's right to engage in lobbying has not been infringed).
 
 
 18
 An organization like the Society can similarly split into two 501(c)(6) associations. Neither affiliate would forfeit its tax-exempt status, as the non-lobbying wing would clearly continue to be a "business league" for purposes of the statute, and the lobbying wing, so long as its activity is directed at furthering a business interest, would also remain tax-exempt under 501(c)(6). See Rev. Rul. 61-177, 1961-2 C.B. 117 (stating that a corporation whose sole activity is to influence legislation relevant to a business interest is exempt under 501(c)(6) if it otherwise meets the requirements of that section).
 
 
 19
 The Society argues, however, that the regulations promulgated in response to the 1993 Act block such a remedy. It points in particular to the Treasury Department's regulation precluding a taxpayer from "structur[ing] its activities with a principal purpose of achieving results that are unreasonable in light of the purposes of section 162(e)(1)(A) and section 6033(e)." Treas. Reg. 1.162-29(f) (1995). Assuming that this applies to an organization that formally segregates its lobbying from its nonlobbying activities through dual incorporation, we see no indication that this is in any way more onerous than the separation criteria referred to in Taxation With Representation. So long as the organization does not attempt to evade 162(e)(1)(A)--by funneling resources to the lobbying wing from the non-lobbying wing--we do not see how it could run afoul of the regulation. In fact, a dual-entity structure is entirely consistent with Congress's intent in enacting the 1993 Act: to withdraw the deduction for lobbying expenses without affirmatively burdening the right to lobby.
 
 
 20
 Apart from its claims that the regulations unduly hamper the dual-entity strategy, the Society invokes Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 587-88 (1983), for the idea that differential tax treatment of the press is subject to heightened scrutiny even when the taxpayer cannot prove the differential burdensome. Similarly, any subjection of lobbying to differential treatment must meet heightened scrutiny. But Taxation with Representation, and the other cases cited above and using only rational basis scrutiny, were all decided after Minneapolis Star (indeed, Taxation with Representation was decided later the same Term). The Court evidently regards the dual incorporation option as obviating the need for heightened scrutiny. Even if we reframe the Society's objection as a claim that the need to adopt a dual incorporation is itself a "differential" (after all, non-lobbying associations that have multiple functions commonly need not subdivide), the Court's decisions necessarily reject the notion.
 
 
 21
 Accordingly, we ask simply whether the provisions bear "a rational relation to a legitimate governmental purpose." Taxation With Representation, 461 U.S. at 547. The parties agree on the legitimacy of withholding the benefits of tax deductibility from lobbying. And the scheme overall clearly bears a rational relation to that goal. For instance, the estimation provision, 6033(e)(1)(A)(ii), allows taxpayers to continue to take a deduction for dues paid to tax-exempt organizations not allocable to lobbying. The carryover and allocation provisions, 6033(e)(1)(C) ensure that taxpayers may not circumvent the Act by taking deductions for money that will fund lobbying activities, directly or indirectly. We find no constitutional violation.
 
 
 22
 * * *
 
 
 23
 The district court's order granting summary judgment for the defendant is
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 A firm that spends $100 on direct lobbying pays tax not only on the $100, but on the $35 needed to pay tax on the $100, and the $12.25 needed to pay tax on that $35, etc. The formula for the sum of an infinite geometric series is a + ar + ar2 + ar3 + ... = a/(1-r), so that a firm in the 35% bracket, seeking to generate $100 for lobbying, needs $100/(1-.35) or $154 in pre-tax income.
 
 
 [2]
 One might wonder why a grant-dependent broadcast licensee could not create an independent affiliate and transfer to it, for fair market value, an entitlement to broadcast in specified time slots. At least one answer is that the FCC has traditionally barred broadcast licensees from creating de facto sublicensees by subdividing spectrum allocations or otherwise parceling out air time to third parties. See Howard A. Shelanski, The Bending Line Between Conventional "Broadcast" and Wireless "Carriage", 97 Colum. L. Rev. 1048, 1069-70 (1997); 47 CFR 73.3555 (1998) (requiring that the licensee "maintain[ ] ultimate control over the station's facilities, including specifically control over station finances, personnel and programming").