**HONOLULU WEEKLY, INC.,**
**a Hawaii Corporation,**
**Plaintiff,**

v.

**Jeremy HARRIS, Mayor of the City and County of Honolulu; Carol L. Costa, Director of the Department of Customer Services; City and County of Honolulu, Defendants.**

**No. CIV. 99–00803SOM/LEK.**

United States District Court,
D. Hawaii.

Dec. 17, 1999.

James J. Bickerton, Scott Saiki, assisting, Bickerton Saunders Dang & Bouslog, Honolulu, HI, for plaintiff.

Jon M. Van Dyke, Gregory J. Swartz, Special Deputy Corporation Counsel, Deputy Corporation Counsel, City and County of Honolulu, Honolulu, HI, for defendant.

### *ORDER GRANTING IN PART AND DE-NYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY IN-JUNCTION*

MOLLWAY, District Judge.

### *INTRODUCTION*

On November 19, 1999, this court issued a temporary restraining order in favor of Plaintiff Honolulu Weekly, Inc. ("Honolulu Weekly"), enjoining Defendants from holding two supplemental lotteries for newspaper dispensing racks in the Waikiki Special District. A more detailed written opinion (filed November 22, 1999) supplemented that order. The temporary restraining order held that, because the regulation at issue in this case, while content-neutral, was not a time, place, and manner restriction that was narrowly tailored to advance any significant governmental interest, Defendants were restrained from holding any lottery that was based on whether applicants required or did not require readers to deposit coins into coin-operated dispensers to obtain the applicants' publications.

The temporary restraining order, by its terms, remained in effect through 11:59 p.m. on November 29, 1999, but was extended by the parties' agreement through the disposition of the present motion for preliminary injunction (filed November 19, 1999). The court GRANTS the requested preliminary injunction because Defendants have failed to demonstrate that the ordinance in question is narrowly tailored to advance any significant government interest. In most respects, the present order repeats the earlier temporary restraining order, although new facts and new arguments presented by the parties have been addressed here, to the extent the court found those new matters relevant to its ruling.

### FINDINGS OF FACT.

1. Waikiki is a recognized symbol of Hawaii, serving as an anchor for Hawaii's tourist industry.[1] Revised Ordinances of Honolulu ("ROH") § 21–9.80(a). Waikiki was rapidly developed in the 1960s and 1970s. The creation of the Waikiki Special District was largely a response to this rapid development. *Id.* The Waikiki Special District is currently one of the most congested areas in the City and County of Honolulu ("Honolulu"). Ex. I (Ordinance 98–66 (December 17, 1998)). The Waikiki Special District was established, in part, to preserve, restore, maintain, enhance, and create natural, recreational, educational, historic, cultural, community and scenic resources. ROH § 21–9.80–1(b).

2. Regulation of dispensing racks is part of Honolulu's comprehensive plan to improve the aesthetic appearance of the streets and sidewalks in the Waikiki Special District in order to enhance the experience of visitors and residents. *See* Affi-

davit of Benjamin B. Lee (December 1, 1999) ¶ 3.

3. In 1989, Honolulu began regulating dispensing racks along Kalakaua Avenue, which is located within the Waikiki Special District. ROH § 29–11.1 *et al.; see* Ordinance 89–14. Honolulu set up two lotteries for dispensing racks along Kalakaua Avenue—one for coin-operated dispensing racks and one for non-coin-operated dispensing racks. *See* ROH § 29–11.1 *et al.*

4. A coin-operated dispensing rack offers a larger display for a publication than a non-coin-operated dispensing rack. *See* Exhibits A and B.

5. Honolulu Weekly is an Oahu-based newspaper of general circulation that was founded in 1991.[2] It is distributed throughout Oahu and has limited distribution on the other Hawaiian islands. Declaration of Laurie Carlson (November 17, 1999) ("Carlson Decl. 1") ¶ 2; TR at 31:2; TR at 24:3–5 (Thorndike testimony indicating that, as a publisher, he considered Honolulu Weekly to be a newspaper of general circulation). Although it occasionally covers national, international, financial, and sports matters, Honolulu Weekly's primary emphasis is on articles that refer to local matters with a mix of information and advocacy. Transcript 12/10/99 ("TR") at 31:6–32:8 (Testimony of Laurie Carlson); Carlson Decl. 1 ¶ 3. Honolulu Weekly is free to its readers. Its expenses are covered by subscriptions and advertising revenue. Carlson Decl. 1 ¶ 4.

6. On December 17, 1998, Mayor Jeremy Harris signed Ordinance No. 98–66, which regulates the dispensing racks outside of Kalakaua Avenue in the Waikiki

---

1. To the extent that any finding of fact stated herein may include or more properly be designated as a conclusion of law, it shall be deemed to be a conclusion of law as well. Similarly, to the extent that any conclusion of law stated herein may include or more properly be designated as a finding of fact, it shall be deemed to be a finding of fact as well. The findings of fact include findings only on those issues necessary for and relevant to this ruling.

2. This court takes judicial notice of the size of Honolulu Weekly. The face of Honolulu Weekly measures approximately 16″ × 11 ½″, which is approximately the same size as the Honolulu Advertiser and the Honolulu Star-Bulletin when those publications are folded in half for distribution. When Honolulu Weekly is folded in half, it is approximately the same size as the Japanese Beach Press and Waikiki News. *See* Ex. AA and BB.

Special District.[3] Ex. I. That Ordinance became ROH § 29–15.1 *et seq.* Like the ordinance governing dispensing racks on Kalakaua Avenue, ROH § 29–15.1, *et seq.,* distinguishes between coin-operated dispensing racks and non-coin-operated dispensing racks. ROH § 29–15.1, *et seq.,* has three enumerated purposes: 1) protecting the health, safety, and welfare of pedestrians; 2) preserving the aesthetics of the Waikiki Special District; and 3) facilitating the distribution of publications.[4] Ex. I; Exhibit O (Committee Report No. 507 (adopted October 14, 1998)) ("This bill is intended to reduce the number of such enclosures and devices on Waikiki sidewalks in order to promote public safety, aesthetics, and ADA compliance").[5] Defendants now propose a fourth purpose for ROH § 29–15.1, *et seq.*—allowing time-sensitive publications to reach their intended audience more quickly. *See* Opposition at 7. This purpose appears to have been articulated solely to oppose the present motion. This asserted purpose is not mentioned in ROH § 29–15.1, *et seq.,* or any of its legislative history and was not mentioned by Defendants even in connection with the recent temporary restraining order. It appears to be an invention born of litigation.

7. Two lotteries were conducted in April 1999 to allocate both coin-operated newsstand dispensing racks and non-coin-operated newsstand dispensing racks in the Waikiki Special District.[6] Revised Ordinances of Honolulu ("ROH") § 29–15.5 (setting forth the lottery procedures).

Each permit granted as a result of those lotteries is valid for three years. ROH § 15–4(d) ("Each permit shall be for a term of three years"). For each location covered by a permit, whether for a coin-operated or non-coin-operated dispensing rack, Defendants require payment of $90 for the three-year period. ROH § 29.15.4(e) ("there shall be a permit fee of $90 per triennium for each space"); Affidavit of Benjamin B. Lee (December 1, 1999) ¶ 11. It costs about $3,097 to $3,297 to construct each dispensing rack enclosure. Lee Aff. ¶ 11. The coin-operated dispensing racks are larger than the non-coin-operated dispensing racks. *See* Exhibits A and B.

8. Honolulu is still in the process of installing permanent dispensing rack enclosures in the Waikiki Special District. TR: 8–9 (Georgina Yuen testimony). Some enclosures appear to be made out of a substance similar to cement. *See* Ex. A–1, A–2, A–11, A–12, and A–13. Other enclosures appear to be composed of aluminum and stone. *See* Ex. B–3, B–4, B–9, B–10, B–11, B–14, B–15, B–16, B–17. The dispensing racks are placed into these permanent enclosures. *See* Ex. A–1, A–2, A–11, A–12, A–13, A–14, B–3, B–4, B–9, B–10, B–14, B–15, and B–16.

9. Four publishers, including Honolulu Weekly, applied for space in coin-operated dispensers during the lottery in April 1999. Lee Aff. ¶ 14. Honolulu Weekly initially applied for 72 permits in the original lottery for coin-operated newsstand dispens-

---

3. Ordinance No. 98–66 was signed after three years of debate and testimony. TR at 33:12–18 (Carlson testimony).

4. ADA compliance is also promoted by ROH § 29–15.1, *et seq.,* because sidewalks that are not as congested allow better access to qualified individuals with disabilities. *See* Ex. O.

5. The parties stipulated to the authenticity of all exhibits. TR at 26:4–11.

6. The term "coin-operated dispensing rack" is defined as "a coin-operated publication dispensing rack, with a clear plastic face, that is constructed to hold and display a publication in such a manner as to protect the publication

from the elements, and the coins deposited therein and the publication from theft." ROH § 29–15.1.

The term "non-coin-operated dispensing rack" is defined as "a clear plastic publication dispensing rack that is not coin-operated and constructed to hold and display a publication in such a manner as to protect the publication from the elements." ROH § 29.15.1.

The city planned to make 288 coin-operated and 680 non-coin-operated dispensing rack enclosures available at the April lotteries. Affidavit of Benjamin B. Lee (December 1, 1999) ¶ 14.

ing racks conducted in April 1999. *See* Exhibit 10 (fourth to last page of exhibit) (Honolulu Weekly's Application for Publication Dispensing Racks). All four publishers received permits for all the locations they desired. Lee Aff. ¶ 14. In Honolulu Weekly's case, that number equaled 21, a revision of the 72 in which Honolulu Weekly initially expressed interest. Carlson Decl. 1 ¶ 20.

10. In the non-coin-operated lottery, 34 publishers applied, and 617 spaces were awarded. Sixty-three spaces were not awarded due to lack of interest. The maximum number of dispensing racks awarded to any one publisher in the non-coin-operated lottery was 34. Lee Aff. ¶ 14.

11. Blair Thorndike testified that his publication, Best of Oahu, was awarded roughly half of the top 25 spots that it desired in the non-coin-operated lottery. TR at 20:12–15. This demonstrates that the chances of receiving a permit were different in the April 1999 lotteries for coin and non-coin dispensing racks. For future lotteries, however, the chances may increase or decrease, depending on the number of applicants then applying as well as the number of spaces available.

12. When Honolulu Weekly applied for the permits before the April 1999 lottery, it was considering whether to charge for its publication. TR at 36:17–23 (Carlson testimony). Upon receipt of Honolulu Weekly's application, Defendants questioned whether Honolulu Weekly intended to charge the public for its publication. *See* Exhibit 1 to Opposition (letter from Roy K. Amemiya, Jr., to Rob Coltin (February 2, 1999)) ("We note that the subject application you submitted to our office indicates your request to participate in the *coin-operated* dispensing rack lottery. Your participation in the coin-operated dispensing rack lottery will require your placement of racks that are coin-operated. Please confirm that you will be charging the public for your publication"); Exhibit Q (letter from Laurie Carlson to Roy K. Amemiya, Jr. (February 8, 1999)). Honolulu Weekly responded that it would "use

*only* the coin-operated racks in the Special District." Exhibit Q. Honolulu Weekly believed that it could use the coin-operated racks, but disengage the coin mechanism. *See generally* TR at 36 to 38.

13. Recognizing the ambiguity of Honolulu Weekly's response, Defendants again asked Honolulu Weekly to confirm that it would "also charge for [its] publication." Exhibit R (letter from Roy K. Amemiya, Jr., to Laurie Carlson (March 2, 1999)). Honolulu Weekly then responded that it "ha[d] not yet determined whether and to what extent it [would] charge for the publication it distributes in the Waikiki Special District." Exhibit S (letter from James J. Bickerton to Roy K. Amemiya (March 8, 1999)).

14. Honolulu Weekly was then informed that its permits would be revoked if Honolulu Weekly "participate[d] in the lottery for permits for the coin-operated dispensing rack enclosures and then attempt[ed] to distribute its publication without charge, using the coin-operated racks." Exhibit T (letter from Gregory J. Schwartz to James J. Bickerton (March 24, 1999)).

15. After being granted 21 permits in the April 1999 lottery for coin-operated newsstand dispensing racks in the Waikiki Special District, Honolulu Weekly purchased 21 newsstand dispensing racks. Carlson Decl. 1 ¶¶ 20–21.

16. On June 24, 1999, Defendants again advised Honolulu Weekly that, unless Defendants were told that Honolulu Weekly would "use the coin-operated dispensing racks in the manner intended," permits for the 21 coin-operated dispensing racks would not be issued. Exhibit U (letter from Roy K. Amemiya, Jr., to Laurie Carlson (June 24, 1999)). On August 12, Honolulu Weekly was again informed that, unless it advised the city "in writing that it intends to install coin-operated mechanisms and actually charge for its publication, the City will not issue permits to *Honolulu Weekly* for the 21 coin-operated dispensing rack enclosure locations awarded to it." Exhibit W (letter from Carol

Costa to James Bickerton, Honolulu Weekly's attorney (August 12, 1999)). Receiving no such written statement, the city did not issue the permits to Honolulu Weekly. *See* Carlson Decl. 1 ¶ 23. Honolulu Weekly has admitted that, although its dispensing racks are designed to receive coins, it intends to distribute its publication free of charge. Carlson Decl. 1 ¶ 22.

17. Two supplemental lotteries were scheduled to be conducted on November 19, 1999, to allocate permits for the vacant coin-operated and non-coin-operated newsstand dispensing racks remaining in the Waikiki Special District. ROH § 29-15.6 (Allocation of Unassigned, Abandoned and Surrendered Spaces); Exhibit 7; *see* November 22, 1999 Order. These supplemental lotteries were enjoined by this court's order dated November 22, 1999. Since that time, no supplemental lottery has been scheduled. Declaration of Carol Costa (December 10, 1999) ¶ 2.

18. Honolulu Weekly stated at the hearing on the motion for temporary restraining order that it had not applied for the supplemental lottery because it believed such an application would be futile. Defendants stated at that same hearing that no advance application is required to participate in the supplemental lottery. *See* November 22, 1999 Order.

19. If Honolulu Weekly is not awarded any permit as a result of either the original or a supplemental lottery, Honolulu Weekly will lose a major opportunity to distribute its newspaper in the Waikiki Special District until the next scheduled lottery in 2002.[7] *See* ROH § 29-15.4(d).

20. At the present time, only three daily newspapers (The Honolulu Advertiser, the Honolulu Star–Bulletin, and USA Today) are distributing publications through coin-operated newsracks in the Waikiki Special District. In the past, the San Francisco Chronicle, the Wall Street Journal, the New York Times, the Los Angeles Times, the Vancouver Sun, the Vancouver Province, and the San Francisco Examiner have all distributed publications through coin-operated newsracks in the Waikiki Special District. Lee Aff. ¶ 12. Defendants anticipate that some of these daily newspapers, or others, may wish to utilize the coin-operated dispensing rack enclosures in the near future. *Id.*

21. Defendants have offered Honolulu Weekly 21 spaces in the non-coin-operated dispensing rack enclosures at the locations that currently remain unclaimed. Affidavit of Benjamin B. Lee ¶ 19. There is no dispute that these enclosures are not in the exact locations for which Honolulu Weekly was originally awarded permits.

## CONCLUSIONS OF LAW.

### Jurisdiction and Venue

1. Honolulu Weekly has alleged violations of its constitutional rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as well as violations of 42 U.S.C § 1983. This Court has federal question jurisdiction to hear and adjudicate such claims, as they arise under federal law. 28 U.S.C. §§ 1331 and 1343. Venue is proper in this court pursuant to 28 U.S.C. § 1391.

### Preliminary Injunction Standard.

2. The standards for granting a temporary restraining order and a preliminary injunction are identical. *Hawai'i County Green Party v. Clinton,* 980 F.Supp. 1160, 1164 (D.Haw.1997). To obtain a preliminary injunction, a party must demonstrate either: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief.[8] *Baby Tam & Co. v.*

---

7. Honolulu Weekly may have other opportunities to obtain other permits if further supplemental lotteries are conducted.

8. Traditionally, there were four factors to be considered in deciding whether an injunction should issue: 1) the likelihood of the plaintiff's success on the merits; 2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; 3) the relative balance of the harm to the plaintiff and the harm to the defendant; and 4) the public interest. *Alaska*

*City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998); *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir. 1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. *Baby Tam,* 154 F.3d at 1100; *Miller v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir.1994). These formulations are not separate tests, but the extremes of a single continuum. *Baby Tam,* 154 F.3d at 1100; *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Alaska v. Native Village of Venitie,* 856 F.2d 1384, 1389 (9th Cir.1988) (*quoting Aguirre v. Chula Vista Sanitary Serv.,* 542 F.2d 779 (9th Cir.1976)).

3. If the plaintiff shows no chance of success on the merits, the preliminary injunction should not issue. Under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987).

4. Finally, a plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Associated General Contractors of California, Inc. v. Coalition For Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

*v. Native Village of Venitie,* 856 F.2d 1384, 1388 (9th Cir.1988). These factors have been collapsed into the current test. *See id.* However, the Ninth Circuit has recently noted that, when the public interest is involved, a district court must examine whether that public interest favors the plaintiff. *Fund for Ani-*

### Honolulu Weekly Has Standing to Assert Its Claims.

5. Plaintiffs who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution that an actual case or controversy exist. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). To have standing to maintain a claim, a plaintiff must demonstrate: 1) an injury in fact—an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not conjectural or hypothetical; 2) a causal relationship between the injury and the challenged conduct—an injury that is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and 3) a likelihood, not mere speculation, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

6. Honolulu Weekly has alleged an injury in fact, e.g., the loss of its First Amendment rights.[9] *See Elrod v. Burns,* 427 U.S. 347, 358–59, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (plurality decision). This irreparable injury demonstrates that Honolulu Weekly's case is not, as Defendants argue, premature. *See* Opposition at 12.

7. While Honolulu Weekly did not apply for the supplemental lottery scheduled for November 19, 1999, this failure is insufficient to demonstrate that Honolulu Weekly's injury was not actual or imminent. Defendants stated at the hearing on

*mals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992).

9. There is no dispute that there is a causal connection between the injury and the challenged conduct or that Honolulu Weekly's injury may be redressed by this court.

the motion for the temporary restraining order that Honolulu Weekly could have applied for the supplemental lottery as late as the time of the lottery. Moreover, Honolulu Weekly stated at that hearing that it did not apply because it felt that it would have been futile to do so. Presumably, had Honolulu Weekly been given the opportunity to participate in the coin-operated lottery, it would have applied for that lottery. Accordingly, Honolulu Weekly has standing. *See Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir.1996) ("Desert and OMG also have standing to challenge the permit requirement, even though they did not apply for permits, because applying for a permit would have been futile"), *cert. denied,* 522 U.S. 912, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997).

■ 8. Defendants' offer to Honolulu Weekly of 21 spaces in the available non-coin-dispensing racks does not demonstrate that Honolulu Weekly has no injury. First, the remaining places available in the non-coin-operated dispensing racks are the less desirable spaces from which the 34 original applicants for the non-coin lottery chose not to distribute their applications. More importantly, Defendants have not demonstrated that they have the power to grant Honolulu Weekly those permits without going through the supplemental lottery process.

**ROH § 29–15, *et seq.,* Is Not Narrowly Tailored to *Advance Defendants' Interests.***

9. Honolulu Weekly argues that the regulatory framework set forth in ROH § 29–15.1, *et seq.,* is unconstitutional because: 1) it violates the Equal Protection clause in that it creates an impermissible classification based on whether readers pay for the publication dispensed from the coin-operated dispensing rack; 2) it violates the First Amendment because it is content-based and it is not necessary to achieve the Defendants' interests; 3) even

if it is content-neutral, it violates the First Amendment because it is not a reasonable time, place, or manner regulation; and 4) it violates the First Amendment and the Due Process clause as a prior restraint because it vests Defendants with unfettered discretion to grant permits. *See* Memorandum in Support of Motion at 2.

10. Honolulu Weekly is likely to prevail on its third argument, i.e., that, even if content-neutral, the regulation violates the First Amendment by failing to regulate time, place, and manner narrowly to advance a significant governmental interest.[10]

■ 11. There is no dispute that the activities in question in this case occurred in a traditional public forum—the sidewalks of the Waikiki Special District. *See Perry v. Los Angeles Police Dept.,* 121 F.3d 1365, 1368 (9th Cir.1997), *cert. denied,* 523 U.S. 1047, 118 S.Ct. 1362, 140 L.Ed.2d 511 (1998). Nor is there any dispute that the First Amendment protects Honolulu Weekly's right to distribute and circulate newspapers through the use of newsracks. *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 768, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("The actual 'activity' at issue here is the circulation of newspapers, which is constitutionally protected[;] … indeed, without the circulation, the publication would be of little value"). Accordingly, time, place, and manner restrictions on Honolulu Weekly's speech are acceptable only if they are content-neutral, serve a significant state interest in a narrowly tailored fashion, and leave open ample alternative communication channels. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Perry,* 121 F.3d at 1368–69.

■ 12. If a restriction is content-based, Defendants must show that it is necessary to serve a compelling state interest and that it is narrowly drawn to

---

10. This court need not address Honolulu Weekly's other three arguments as the grant-ing of the preliminary injunction is justified based on Honolulu Weekly's third argument.

achieve that end. *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

13. A regulation is content-neutral if it is justified without reference to the content of the regulated speech. *Perry*, 121 F.3d at 1369. ROH § 29–15.1, *et seq.*, merely draws a distinction between those publications being distributed via coin-operated and non-coin-operated dispensing racks. The regulation does not draw a distinction based on the content of the publication. *See City of Cincinnati v. Discovery Network*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *One World One Family v. City and County of Honolulu*, 76 F.3d 1009, 1012 (9th Cir.) ("A speech restriction is content-neutral if it is justified without reference to the content of the regulated speech") (internal quotation omitted); *cert. denied*, 519 U.S. 1009, 117 S.Ct. 554, 136 L.Ed.2d 403 (1996).[11] The test is whether the government has adopted the restriction because of disagreement with the message it conveys. *One World*, 76 F.3d at 1012.

14. In the present case, the parties are not distinguishing between newspapers and commercial speech, but instead between publications that are available for purchase and publications that are free. *See* Carlson Decl. ¶ 14 ("The *Honolulu Advertiser* and the *Honolulu Star–Bulletin* are direct competitors of the Honolulu Weekly ... and the Honolulu Weekly

seeks to reach the same audience of readers who are interested in news and commentary on Honolulu's social, political, cultural and economic life"). Because the regulation at issue in this case only distinguishes between coin-operated and non-coin-operated dispensing racks, and because it makes no reference, directly or indirectly, to the content of anyone's speech, the regulation is content-neutral.[12]

15. Defendants argue that *Leathers v. Medlock*, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (holding that a sales tax of general applicability that exempted print media was not content-based even though cable television was not exempted) demonstrates that ROH § 29–15.1, *et seq.*, is not content-based. Although arising in a factually different context, *Leathers* demonstrates that government may treat similar media differently so long as that treatment is not based on the content of the media.

16. One of Defendants' proposed purposes of ROH § 29–15.1, *et seq.*, is that it is fostering time-sensitive publications through the coin and non-coin distinction. This court noted in its findings of fact that this purpose appears to have been articulated solely for litigation purposes. Even if the court had evidence that the City had adopted ROH § 29–15.1, *et seq.*, to foster distribution of time-sensitive publications, this purpose would not protect Defendants

**11.** Although the coin-operated dispensing racks currently distribute newspapers that publish "news" and the non-coin-operated dispensing racks currently distribute publications that consist primarily of commercial speech (*see*, e.g. Ex. A–12), ROH § 29–15.1, *et seq.*, is nevertheless content-neutral because it makes no reference, directly or indirectly, to the content of the publications. A publication consisting of primarily commercial speech is not prohibited from utilizing the coin-operated machines as long as it charges for its publication. *City of Cincinnati* is therefore distinguishable. In *City of Cincinnati*, the Supreme Court found unpersuasive the defendants' argument that Cincinnati's regulation of newsracks was content-neutral. The Supreme Court found that the very basis for that regulation was the difference in content between ordinary newspapers and com-

mercial speech. *Id.* at 429, 113 S.Ct. 1505 ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack"). Unlike the present case, the regulation at issue in *City of Cincinnati* involved a complete ban on commercial handbilling in any public place. *Id.* at 413 n. 3, 113 S.Ct. 1505 ("Nor shall any person hand out or distribute or sell any commercial handbill in any public place").

**12.** Had the regulation been content-based, then this court would have had to determine whether the regulation was necessary to serve a compelling governmental interest and was narrowly drawn to that end. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Had this standard been used, the same result would have been reached.

on this motion. To the contrary, the proposed purpose would certainly approach the line of making ROH § 29–15.1, *et seq.*, content-based. However, this court need not decide whether this proposed purpose actually crosses the line and renders the ordinance content-based. The ordinance fails constitutional muster on the lower content-neutral test, and the court need go no further.

■ 17. A content-neutral regulation's restrictions on time, place, and manner of expression must be narrowly tailored to advance a significant governmental interest. *Perry,* 460 U.S. at 45, 103 S.Ct. 948, 74 L.Ed.2d 794; *Perry,* 121 F.3d at 1368–69.

18. In the present case, Defendants assert three governmental interests that Defendants claim are sufficiently significant to justify their distinction between publications that charge and publications that are free: 1) aesthetics, which Defendants say they advance by grouping similar types of dispensing racks together, which in turn promotes more compact dispensers; 2) safety, which Defendants say they advance by alleviating hazards for pedestrian traffic; and 3) convenient circulation of time-sensitive material.

■ 19. Although there is no clearly established definition of the "significant governmental interest" that a content-neutral regulation must advance, case law has established that aesthetics and safety can be significant governmental interests. *One World,* 76 F.3d at 1013 (holding that Honolulu has a significant interest in eliminating the visual clutter caused by unsightly t-shirt vendors and in assuring safe, convenient, and orderly circulation of pedestrians on the streets of Waikiki); *see Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805–07, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("It is well settled that the state may

legitimately exercise its police powers to advance [a]esthetic values"); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 508–10, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion) (recognizing aesthetics and safety as valid interests in reviewing a prohibition on off-site commercial billboards and all noncommercial billboards); *see also Perry,* 121 F.3d at 1369 (stating that governmental interests in promoting public safety and the orderly movement of pedestrians are considered significant). However, Defendants have cited no authority indicating that facilitating distribution of time-sensitive publications is a "substantial" government interest.[13] Accordingly, this court concludes that two significant government interests—aesthetics and safety—may support ROH § 29–15.1, *et seq.,* for purposes of reasonable time, place, and manner restrictions.

■ 20. A government may serve its legitimate interests only through narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedom. *Perry,* 121 F.3d at 1369. The requirement of narrow tailoring is satisfied as long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation. *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). As long as the means chosen is not substantially broader than necessary to achieve the government's interest, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. *Id.* at 800, 109 S.Ct. 2746. A reasonable time, place, and manner restriction need not be the least restrictive or least intrusive alternative. *One World,* 76 F.3d at 1014.

---

13. Based on *Mabee v. White Plains Pub. Co.,* 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946), Defendants argue that it is permissible to catagorize publications with time-sensitive materials. That case, however, dealt with whether it was permissible to exempt certain small weekly and semi-weekly publications from wage and hour requirements. That analysis has no applicability here.

21. ROH § 29–15.1, *et seq.*, violates the First Amendment because, as applied, it is not narrowly drawn to advance the stated governmental interests. As applied, the regulation is a sweeping restriction that is not narrowly tailored to serve either aesthetics or safety. The placement of enclosures containing the coin-operated and non-coin-operated dispensers is left to the discretion of the Director of Budget and Fiscal Services of the City and County of Honolulu ("Director"). ROH § 29–15.3(b)(1) ("The design, dimensions, placement, materials and orientation of each enclosure shall be determined by … the director"). The Director has determined that, under this regulation, only publications for sale may use the coin-operated dispensing racks. Those racks clearly offer a better, larger display for a publication than the non-coin-operated dispensing racks. Preventing free publications from using coin-operated dispensing racks (while requiring no actual coins) does not affect aesthetics or safety at all as there is no relation between the act of paying for a publication and Honolulu's aesthetic or safety purposes.

22. In their argument to the court, Defendants also argued that the "compactness" of the dispensing racks furthers safety and aesthetics. Defendants say that, because they want publications in the smallest space possible, Honolulu Weekly should not be allowed to use a coin-operated space while not using the coin mechanism that takes up so much of the space. Defendants note that the space taken up by the coin mechanism will be wasted. This argument is unpersuasive. Any coin-operated dispenser, whether involving wasted space or not, would have to fit into an enclosure. It is the enclosure's presence, placement, and size that affects public safety, not the dispenser sitting in the enclosure. Thus, it is only aesthetics that could arguably be affected by wasted space.

23. Defendants' asserted concern about avoiding wasted space with respect to an unused coin mechanism on the outside of a dispenser is belied by Defendants' lack of concern when space within a coin-operated dispenser is wasted. A very small, brochure-sized publication would waste space sitting in a newspaper-sized dispenser, but that waste would be allowed if the brochure was sold rather than given away. This inconsistency is highlighted by the fact that Defendants are now wasting space by letting many of the coin-operated dispensing rack enclosures remain vacant.

24. Defendants created and are creating the problem of wasted space by installing permanent enclosures into which the coin-operated dispensing racks are placed. The coin-operated dispensing racks are required to be a standard size, regardless of the size of the publication and the use of the coin-mechanism, simply to fit into the enclosure. Having created a space-wasting system, Defendants are unconvincing in now asserting "compactness."

25. Achieving "compactness" by restricting coin-operated dispensers to publications for sale, while allowing enclosures to sit vacant when that particular brand of "compactness" cannot be achieved, flies in the face of logic. Clearly that definition of "compactness" is not narrowly tailored to meet aesthetic interests. Indeed, this court is struck by what, in the commercial speech context, the Supreme Court referred to as the "overall irrationality" of the regulating scheme as a means of achieving "compactness." *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). In the commercial speech context, the Supreme Court has held that a "regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). To the contrary, the regulation must advance the government's interest "in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). As Honolulu Weekly is entitled to even greater protection than purely commercial speech re-

ceives, *see Central Hudson,* 447 U.S. at 563, 100 S.Ct. 2343, Defendants must, at the very least, show a "direct and material" connection between the ordinance and the goal of "compactness." Defendants fail to do this.

26. Because the regulation at issue in this case is not narrowly tailored to advance a significant governmental interest, Honolulu Weekly has demonstrated a likelihood of success on the merits of its First Amendment violation claim. Because this court finds that Honolulu Weekly is likely to succeed on the merits of its First Amendment claim, Honolulu Weekly has also shown irreparable injury. *See Elrod,* 427 U.S. at 358–59, 373, 96 S.Ct. 2673. The public interest will be better served by an equitable distribution of the publication dispensing racks than by the overly broad restrictions Defendants have imposed. Indeed, the public's interest in aesthetics and safety need not be compromised at all by an equitable distribution. Honolulu Weekly has therefore satisfied the TRO standard.

27. This court stresses that it is not by this order issuing a blanket prohibition on all separate lotteries for coin-operated and non-coin-operated dispensers. The court is only enjoining the holding of lotteries based on the present scheme of distinguishing between publications that are for sale or free. Conceivably, Defendants might be able to justify lotteries based on the dimensions of publications and their resulting "fit" with the dimensions of dispensers. That scheme, however, is not presently before this court.

### CONCLUSION.

Having demonstrated both a likelihood of success on the merits, irreparable injury, and benefits to the public, Honolulu Weekly is entitled to a preliminary injunction. Defendants are enjoined from restricting applicants (based on whether those applicants charge or do not charge for their publications) from any lottery awarding space in any dispensing rack enclosure pursuant to the procedures set forth in Revised Ordinances of Honolulu section 29–15.1 *et seq.* The remainder of the relief requested by Honolulu Weekly is denied.

IT IS SO ORDERED.