COMCAST CABLEVISION OF BROWARD COUNTY, INC., and Advocate Communications, Inc., d/b/a Advanced Cable Communications, Plaintiffs,

v.

BROWARD COUNTY, FLORIDA, Defendant.

TCI TKR of South Florida, Inc., and MediaOne of Greater Florida, Inc., Plaintiffs,

v.

Broward County, Florida, Defendant.

No. 99CV6934.

United States District Court, S.D. Florida.

Nov. 8, 2000.

Philip J. Kantor, Terry S. Bienstock, Jeffrey Allen Jacobs, Bienstock & Clark, Miami, FL, for Plaintiffs Comcast Cablevision of Broward County, Inc and Advocate Communications, Inc.

Ralph Benjamine Reid, Gary Michael Pappas, Carlton Fields Ward Emmanuel Smith & Cutler, Miami, FL, for Plaintiffs TCI TKR of South Florida, Inc. and MediaOne of Greater Florida.

Alan Steven Becker, Gary Charles Rosen, Becker & Poliakoff, Fort Lauderdale, FL, Gary Charles Rosen, Becker & Poliakoff, Fort Lauderdale, FL, Roberto Martinez, Dean Churchill Colson, Enid Duany Mendoza, Colson Hicks Eidson, Coral Gables, FL, Luis Sergio Konski, Becker & Poliakoff, Miami, FL, Michael Carvin, Cooper Carvin & Rosenthal, Washington, DC, for Defendant.

## ORDER GRANTING PLAINTIFFS' CROSS–MOTIONS FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE is before the Court upon cross-motions for summary judgment. The Court has reviewed the extensive factual submissions and excellent memoranda of law filed by the parties, and heard oral argument.

## I. INTRODUCTION

The issue presented in this case is whether the First Amendment to the United States Constitution restricts the authority of local government to require a cable television system which offers its subscribers high-speed Internet service to allow competitors equal access to its system. Broward County, a political subdivision of the State of Florida, has adopted an ordinance that requires any cable system franchisee to provide any requesting Internet service provider access to its broadband Internet transport services on rates, terms, and conditions at least as favorable as those on which it provides such access to itself.

The County contends that the ordinance is necessary to level the playing field among competitors and guarantee its citizens access to a diversity of Internet service providers, further justifying the ordinance as part of the price for use of the public rights-of-way. The cable companies targeted by the ordinance contend that they are entitled to the speech and press protections of the First Amendment and that it is not within the County's power to decide the programming available on their systems. For the reasons that follow, I conclude that the ordinance unconstitutionally abridges freedom of speech and the press.

## II. BACKGROUND

### A. The Ordinance

On July 13, 1999, at the prompting of GTE, a telephone company offering competing services,[1] the Broward County Commission adopted Ordinance No.1999–41. The ordinance, which is applicable to all County granted cable franchisees, states:

*Nondiscriminatory Access Required.* Subject to technical feasibility, Franchisee shall provide any requesting Inter-

---

1. The ordinance was drafted by counsel for GTE and sent by them to the Broward County Commission. GTE also agreed to indemnify Broward County for any costs and fees that might be incurred as a result of a legal challenge to the ordinance.

net Service Provider access to its Broadband Internet Access Transport Services (unbundled from the provision of content) on rates, terms, and conditions that are at least as favorable as those on which it provides such access to itself, to its affiliate, or to any other person. Such access shall be provided at any technically feasible point selected by the requesting Internet Service Provider.

Ordinance No. 199–41, Sec. 1.02, Access to Broadband Internet Access Transport Services, Exhibit A to Plaintiffs Comcast and Advanced Cable's Appendix to Statement of Material Facts in Support of Summary Judgment.

The ordinance was adopted by a 4–3 majority of the County Commission. The Commission's staff recommended against adopting the ordinance.

## B. The Debate

### 1. *Broadband*

"Broadband" refers to technology that allows users to access the Internet at speeds significantly higher than the modems typically used today. Currently, many Americans who use the Internet do so at speeds less than 56 kbps. Broadband technology allows users access at speeds that range from fifty to several hundred times faster. This increased speed will provide for a range of enhanced services and, in all likelihood, will change the way consumers communicate, shop, educate, and entertain. It is estimated that approximately two million Americans presently have access to broadband technology. By 2008, that number is predicted to reach 78 million. *See A Staff Report to William E. Kennard, Chairman, Federal Communications Commission on Industry Monitoring Sessions Convened by Cable Services Bureau,* October, 1999, *Broadband Today,* at 9. The increasing demand for broadband services has been driven by the explosive growth of the Internet, which has risen from 10 million users in 1995, to 150 million worldwide users in 1999. *See id.* at 16.

### 2. *Cable Broadband*

The cable industry is transforming from closed cable systems that feature one-way delivery of analog television signals to two-way interactive broadband systems, involving a hybrid of coaxial and fiber optic technologies. Historically, cable networks were constructed to provide only video programming services that required only one-way transmission of signals. Until recently, a typical one-way cable system provided approximately 50 channels of analog video. The network was a full coaxial system with a centralized headend, trunk lines leading to the neighborhoods, and distribution lines carrying the signal to the consumer.

Today, coaxial systems are being replaced by hybrid systems referred to as hybrid fiber-coaxial or "HFC." The replacement of coaxial cable with fiber optic cable enables cable operators to deliver applications at very high data rates.

These new networks allow a cable operator to offer more than 100 analog video channels, hundreds of digital video channels, as well as provide capacity for Internet access, telephony and other services. With respect to Internet access, upgraded cable systems can carry data up to several hundred times faster than transmission using dial-up modems over ordinary telephone lines, and a hundred times faster than ISDN (integrated services digital network) telephone lines. Because a cable network is a shared medium, these speeds vary depending on the number of actual subscribers using the Internet connection at the same time. *See id.*

### 3. *Telephone Company Broadband*

Digital Subscriber Line (DSL) is the telecommunications carriers' version of broadband access. With DSL, the average analog connection of 56.6 kbps can be increased to 1.5 Mbps or higher.

DSL technology upgrades the performance of the standard copper line connecting most homes and businesses to carry high capacity data transmission. The technology expands the amount of frequency used over the copper line, whereby the line's higher frequencies are used to transmit the data and the lower frequencies are free to transmit voice or fax transmissions. Thus, DSL is able to function on a line simultaneously with standard voice and fax services and avoids the installation of a separate line. Since the technology works over the existing telephone system, DSL is significantly less expensive to deploy on a broad scale than new fiber or cable construction.

There are two general categories of DSL service, symmetrical and asymmetrical. Symmetrical versions offer the same data rates upstream and downstream and are well suited for business applications. Asymmetrical versions offer different data rates upstream and downstream and are best suited for residential users who receive a lot of data but do not originate or send much. One version, asymmetric digital subscriber line (ADSL), allows a user to simultaneously browse the Internet or watch a movie while talking on the telephone. It is said that ADSL provides a competitive advantage over cable modem Internet access in the following areas:

* Simultaneous fast Internet and voice/fax capabilities over a single telephone line.

* Data security over a dedicated point-to-point line which is not available over a shared medium such as cable.

* Dedicated bandwidth that guarantees performance regardless of the number of users on the network unlike cable modems where actual performance deteriorates as the number of users increases.

See *id.* at 20–21.

### 4. *Wireless: Fixed and Satellite*

There will be various companies offering local broadband access using wireless tech-nologies. Fixed wireless providers are using their existing microwave networks to transmit high speed Internet services. Fixed wireless providers avoid the high costs and delays associated with laying fibers or upgrading cable networks and can therefore enter the market quickly at relatively low costs. The technology also presents obstacles, however, most notably the line of sight requirements between the transmitter and receiving antenna.

There are several satellite providers that are constructing systems and plan to start offering two-way broadband satellite services by 2001. With their unlimited coverage, satellite systems will offer broadband access to virtually any part of the United States. See *id.* at 21–22.

### 5. *National Broadband Policy*

In 1996, Congress directed the Federal Communications Commission (FCC), in section 706 of the Telecommunications Act, to monitor the development of broadband capability and, if necessary, to take steps to accelerate the deployment of broadband capability. See *generally Advanced Services Report,* 14 FCC Rcd. 2398 (1999). Section 706(c) is entitled "advanced telecommunications capability," which Congress defined "without regard to any transmission media or technology, as high speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology." Pub.L. No. 104–104, Title VII, § 706(c), 110 Stat. 153 (1996) (reproduced in the notes under 47 U.S.C. § 157).

In February, 1999, the FCC released its initial report concerning advanced communications capability as directed by the Congress. See *Advanced Services Report, supra.* In its 1999 report, the FCC found that there is reasonable and timely deployment of broadband capability and that there was no need at that time for regulatory intervention in the broadband market.

*See id.* at § 101. The Commission announced that it would continue to closely monitor the deployment of broadband and planned to issue additional reports on broadband deployment during each calendar year. *See id.* at § 19.

The FCC also considered the issue of Internet access in considering the merger of AT & T, at the time the nation's largest long distance telephone provider, and Telecommunications, Inc., one of the largest cable television operators. In its order approving the transfer of licenses from TCI to AT & T, the FCC rejected any open access condition, citing the emergence of competing methods of high speed Internet access. It found "that the equal access issues raised by the parties to this proceeding do not provide a basis for conditioning, denying, or designating for hearing any of the requested transfers of licenses and authorizations." *See Applications for Consent to the Transfer Control of Licenses and Section 214 Authorizations from TCI to AT & T,* 14 FCC Rcd. 3160, 1999 WL 76930 (Feb. 18, 1999) ("Transfer Order"). The FCC concluded that "while the merger is unlikely to yield anti-competitive effects, we believe it may yield public interest benefits to consumers in the form of a quicker roll-out of high-speed Internet access services." *Id.* at § 94.

In October 1999, the Cable Services Bureau of the FCC released a report on the state of the broadband industry. With respect to broadband cable access, the Report concluded:

> [T]he Bureau is not persuaded that consumers are at risk of cable establishing a bottleneck monopoly in broadband services in the absence of immediate regulatory action. There have been no developments since the release of the Section 706 Report earlier this year to alter the Commission's conclusion that no monopoly exists. Moreover the monopoly argument wrongly assumes that cable is the only viable broadband pipe available in the near term to provide Internet access to the home. As deployment of DSL, satellite and wireless advances in large part spurred by rapid cable modem deployment, consumers will have alternative platforms to use for high-speed data access, telephony and video services. We have already seen evidence that these alternative technologies are attracting new subscribers at an exponential rate, and that prices for these new services are falling.

*Broadband Today, supra,* at 42.

### C. Activities of the Plaintiffs

MediaOne Florida is a wholly owned subsidiary of MediaOne Group, Inc., a holding company that owns numerous subsidiaries (collectively "MediaOne") providing cable services to subscribers in various regions of the United States. In 1999, MediaOne Group announced a plan to merge with AT & T, and the FCC has granted approval to the merger. *See* Memorandum Opinion and Order, *In the Matter of Application of Consent to the Transfer of Control of Licenses and Section 214 Authorizations From MediaOne Group. Inc., Transferor, to AT & T Corp., Transferee,* 2000 WL 725472, CS Docket No. 99–251 (June 6, 2000) ¶ 1 ("MediaOne Merger Order").

In its cable franchise areas, MediaOne offers (or has made plans to offer) a high-speed interactive cable modem service called "RoadRunner" as a programming option available to its cable subscribers for an extra charge (as are other programming options such as HBO or certain movie channels). The RoadRunner programming service provided by MediaOne contains content, applications (e.g., games and chat boards), and Internet connectivity. RoadRunner provides MediaOne with a network of computers and facilities to deliver these services to cable systems.

TCI TKR is a wholly owned subsidiary of Tele–Communications, Inc. ("TCI"). TCI is a national cable company that provides cable services to millions of subscribers across the country through its local

subsidiaries. In 1998, TCI announced a plan to merge with AT & T Corp. The merger was consummated in March 1999. *See* Memorandum Opinion and Order, *In the MATTER OF APPLICATIONS FOR CONSENT TO THE TRANSFER OF CONTROL OF LICENSES AND SECTION 214 AUTHORIZATIONS FROM TELE-COMMUNICATIONS, INC., TRANSFEROR TO AT&T CORP., TRANSFEREE,* CS Docket No. 98–178, 1999 WL 76930 (Feb. 17, 1999) ¶¶ 5–8 ("TCI Merger Order").

TCI and others formed a company now named Excite@Home ("@Home") to develop content for cable modem services and to develop a network of computers and facilities to deliver the content and Internet connectivity to TCI's cable systems. Separately, TCI has entered into arrangements with the *Chicago Tribune* and others to supply local news and content for TCI's cable modem service. In its cable franchise areas throughout the country, TCI offers (or has made plans to offer) @Home to its cable subscribers as a single integrated programming option available for an extra charge.

TCI's cable modem offering is made pursuant to an exclusive contract with @Home, and MediaOne's offering is made pursuant to an exclusive contract with RoadRunner. These contracts remain in effect until 2002. @Home and MediaOne's RoadRunner service allow subscribers high-speed access to the Internet and all publicly available content on it. This includes the web pages of America Online, Mindspring, and all other ISPs. Thus, TCI and MediaOne subscribers, by paying the monthly rate for @Home or RoadRunner service, can access any information or content that is publicly available anywhere on the Internet, regardless of the source of that information or content.

TCI and MediaOne acquire or produce news, information, and advertising content and publish it on the respective "first pages" of the @Home and RoadRunner services they offer subscribers. The "first page" is the default screen that TCI and MediaOne subscribers see when they access TCI's @Home or MediaOne's RoadRunner service.

All subscribers to the @Home or RoadRunner programming receive and are exposed to the "first page" and its content when they initially access the service. This is also the case each time thereafter, unless the subscriber changes the "first page."

@Home and RoadRunner subscribers can change the "first page" they see when they access the Internet from MediaOne's "first page," for example, to America Online's or any other ISP's. However, most @Home and RoadRunner subscribers choose to retain the "first pages" produced by TCI and MediaOne as their default start-up screen.

TCI and MediaOne both sell the right to advertise on their "first pages" and use the revenues to subsidize the transmission cost of their cable modem services.

Because of the passage of the ordinance, TCI and MediaOne have halted all plans to offer their respective cable modem programming options to customers in unincorporated Broward County. MediaOne Florida has announced that it will not offer cable modem services in unincorporated Broward County as long as the ordinance remains in effect. TCI TKR has also postponed plans to offer such services in Broward pending the outcome of this litigation, placing its plans to upgrade its systems in unincorporated Broward County at the bottom of its prioritization list. MediaOne is currently offering and providing two-way RoadRunner service to subscribers in incorporated sections of Broward County, where the ordinance does not apply.

### III. ANALYSIS

#### A.

█ It is now well established that regulation of cable operators implicates both

the Free Speech and Free Press clauses of the First Amendment. *See, e.g., Turner Broadcasting System, Inc. v. F.C.C. (Turner I )*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Leathers v. Medlock*, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991); *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). Through "original programming or by exercising editorial discretion over which stations or programs to include in its repertoire," cable programmers and operators "see[k] to communicate messages on a wide variety of topics and in a wide variety of formats." *Turner I*, 512 U.S. at 636, 114 S.Ct. at 2456 (quoting *Preferred Communications*, 476 U.S. at 494, 106 S.Ct. at 2037).

In this case, the plaintiff cable operators seek to offer broadband Internet service. Along with movies, weather, sports, news and entertainment programming, such as the Weather Channel, HBO, VH1 and CNN, the Plaintiffs have selected an Internet service—Advanced Communications has selected ISP Channel; MediaOne has selected RoadRunner; and TCI, along with others, has founded @Home. Each selection offers distinctive programming and format. According to the Plaintiffs, their choices were made from an array of opportunities and reflected a choice based upon content. Their choice required them to forego other programming because of the physical limitations of their system. They plan to market their Internet provider as an integral part of their overall programming. Under their business plan, advertising is sold to create income for their Internet service in addition to payments from their subscribers.

The Plaintiffs now have exclusive contracts with their Internet providers. Pursuant to the contracts, the Internet providers participated in the installation of equipment to establish the system. The Plaintiffs advise that as these exclusive contracts expire, they are considering the addition of other Internet providers as part of their offering. They say this is driven by audience demand for some services. They consider some Internet providers unacceptable because of offensive or hateful programming. The Plaintiffs say they are not, and do not want to become, a transport service, and that their offerings are a matter of choice.

Broward County acknowledges that a cable operator may be entitled to protection for its own content, but contends that the transmission mechanism employed by the cable operator enjoys no First Amendment protection and may be separated out for regulation. "Plaintiffs are 'singled out' because of their possession of a unique facility—the transmission conduit—not because of anything they say, do not say, or wish to say." Broward County's Reply and Response at 2. According to the County, the cable operators possess "a valuable conduit" that "should be shared among content providers to create the conditions for vigorous competition, innovation, and consumer choice." *Id.* at 2. The County claims to regulate "only trade practices and not speech." *Id.* at 4.

The County argues that its ability to regulate is not constrained by the Plaintiffs' business plan. The County contends that it has the authority to separate the provision of Internet service from the transportation mechanism owned by the cable companies and offers this hypothetical to explain its approach:

> Suppose to reduce noise and pollution, the County granted one delivery company a public franchise to deliver newspapers each morning. That company then "ties" the delivery franchise to its own newspaper—it adopts a rule that the consumer must purchase its newspaper in order to receive delivery of any other newspaper.

Broward County's Memorandum in Support of Summary Judgment at 8.

According to the County, its action "untying" these services would be "economic regulation" not subject to heightened First

Amendment scrutiny. The "flaw" in the argument of the cable operators, claims the County, is that "it mistakes the truck for the newspapers—the delivery service (or transmission) for the content." *Id.*

### B.

The Supreme Court, however, has repeatedly held that "[l]iberty of circulating is as essential to [freedom of the press] as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Ex Parte Jackson,* 96 U.S. 727, 733, 6 Otto 727, 24 L.Ed. 877 (1877); *see also City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 768, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988) ("The actual 'activity' at issue here [placement of newsracks] is the circulation of newspapers, which is constitutionally protected."); *Lovell v. City of Griffin, Ga.,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("The ordinances [prohibiting distribution of circulars] cannot be saved because it relates to distribution and not to publication."). Liberty of circulating is not confined to newspapers and periodicals, pamphlets and leaflets, but also to delivery of information by means of fiber optics, microprocessors and cable. "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Id.*

In arguing that the conduit or transmission capability of speech can be separated from its content, the County ignores the relationship between the two. Although all would agree that the First Amendment protects freedom of thought and expression, it is equally true that thought is nonverbal and necessarily requires speech to be communicated. Moreover, technology extends the senses, permitting faster communication beyond reach of the human voice. The printed word brought uniformity and repeatability and permitted widespread circulation through books and then newspapers. The increasing speed of information gathering and publication also has created new forms of arranging and circulating information affecting not only the physical appearance of the press but also the prose of those contributing to it. For example, movies, by speeding up the mechanical, moved us from sequence to configuration and structure while the immediacy of radio and television has eliminated distance and time. In short, content and technology are intertwined in ways which make analytical separability difficult and perhaps unwise.

The present case involves broadband technology. Broadband cable Internet service brings instant two-way communication that can accommodate tremendous amounts of information in video, audio, and printed form. Undoubtedly, it will affect our economy and culture, as have the other technologies for human expression. As Marshall McLuhan said over thirty years ago, to a substantial extent, "the medium is the message." Marshall McLuhan, *Understanding Media: The Extension of Man,* McGraw–Hill (1964). If so, the question then becomes, can government regulate the technology of expression without also changing its meaning?

### C.

The Broward County ordinance operates to impose a significant constraint and economic burden directly on a cable operator's means and methodology of expression. The ordinance singles out cable operators from all other speakers and discriminates further against those cable operators who choose to provide Internet content. The ordinance has no application to wireless, satellite, or telephone transmission or other providers of Internet service. In these respects, the ordinance operates in much the same manner as the use tax held to violate the First Amendment in *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); *see also Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Grosjean v. American Press Co.,*

297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). *But see Leathers v. Medlock,* 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991).

■ A primary purpose of the First Amendment is "to preserve an untrammeled press as a vital source of public information." *Grosjean,* 297 U.S. at 250, 56 S.Ct. at 449. The free press clause protects not only the words which appear on a newspaper's pages, but its printing and circulation as well. As Justice Stewart has written:

> [T]he Free Press guarantee is in essence a *structural* provision of the Constitution. Most of the other provisions in the Bill of Rights protect specific liberties or specific rights of individuals: freedom of speech, freedom of worship, the right to counsel, the privilege against compulsory self-incrimination, to name a few. In contrast, the Free Press Clause extends protection to an institution.

Potter Stewart, "Or of the Press," 26 Hastings L.J. 631, 633 (1975) (emphasis added).

Under the First Amendment, government should not interfere with the process by which preferences for information evolve. Not only the message, but also the messenger receives constitutional protection.

The Broward County ordinance invidiously impacts a cable operator's ability to participate in the information market. The cable operator, unlike a telephone service, does not sell transmission but instead offers a collection of content. Like a newspaper, a cable operator sells advertising to defray the costs of its service. Advertising allows an operator to keep subscriber rates lower than would otherwise be the case, an attraction in obtaining the critical mass of subscribers necessary to pay for the sizable investment in physical plant. *See* Affidavit of Thomas Cullen ¶ 11, Exhibit I, Plaintiffs Comcast and Advanced Cable's Appendix to Statement of Material Facts in Support of Summary Judgment (Volume II).

The business plan adopted by the cable operators is not the only one possible and may not succeed. Some Internet service providers, for example, Altavista, offer free access to the Internet relying only on advertising for revenues. This model is more similar to that used by broadcast television or radio. *See* Declaration of Janusz A. Ordover ¶¶ 140–43, Exhibit B, Declarations in Support of Plaintiff TCI TKR of South Florida, Inc. and MediaOne of Greater Florida, Inc.'s Cross–Motion for Summary Judgment. Others may rely solely on subscriber fees. The imposition of an equal access provision by operation of the Broward County ordinance both deprives the cable operator of editorial discretion over its programming and harms its ability to market and finance its service, thereby curtailing the flow of information to the public. It distorts and disrupts the integrity of the information market by interfering with the ability of market participants to use different cost structures and economic approaches based upon the inherent advantages and disadvantages of their respective technology.

### D.

The impact of the access requirement on a cable operator and the application of First Amendment analysis to the ordinance can be demonstrated by slightly changing the hypothetical posed by the County in its memorandum supporting summary judgment. Suppose the Broward County Commission, concerned about the ability of consumers to gain access to classified advertising and other sources of information, adopted an ordinance requiring *The Ft. Lauderdale News and Sun Sentinel* to deliver *The Miami Herald, The New York Times,* and the printed material of anyone who made a request on the same terms as it delivered its own newspaper. Could such an ordinance withstand scrutiny under the First Amendment?

Since Broward County's access regulation is only triggered by a cable operator's decision to offer an Internet information channel, it is very similar to the Florida law which led to the Supreme Court's decision in *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). That case involved a Florida law which provided for a right of reply to every attack upon a candidate for office which appeared within the newspaper. The reply was required to be in as conspicuous a place and in the same kind of type as the charges that prompted the reply, provided it could not take up more space than the charge which prompted the reply. The argument of the proponents of that measure are echoed by the County's arguments here—that government has an obligation to ensure that a wide variety of views reach the public. It was argued that concentration of ownership and the expense of entry into publishing had resulted in a loss of any ability by the public to respond or contribute in any meaningful way to debate on issues. One newspaper towns had become the rule, said access proponents, with effective competition operating in only four percent of large cities.

The Supreme Court unanimously rejected these arguments finding that an enforceable right of access brings about a direct confrontation with the express provisions of the First Amendment. *See id.* at 254, 94 S.Ct. at 2838. As the *Tornillo* Court explained:

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to the limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how government regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved this time.

*Id.* at 258, 94 S.Ct. at 2840. It is ironic that a technology, which is permitting citizens greater ease of access to channels of communication than has existed at any time throughout history, is being subjected to the same arguments rejected by the Supreme Court in *Tornillo*. Broward County's ordinance intrudes upon the ability of the cable operator to choose the content of the cable system and imposes a cost in time and materials in order to make available the space that may be demanded. The result has been that cable operators have not provided Internet service in unincorporated Broward County. Compelled access like that ordered by the Broward County ordinance both penalizes expression and forces the cable operators to alter their content to conform to an agenda they do not set. *See generally Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986).

### E.

The history of the First Amendment also informs its command. For, as Justice Holmes stated, "[a] page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 41 S.Ct. 506, 65 L.Ed. 963 (1921).

Upon introduction of the printing press, Henry VIII proclaimed that the prices of books must be reasonable, that foreign books not be sold in England, and that printers must have royal permission to set up shop.[2] The charter of the Stationer's Company prohibited all printing except by members of the company or those having a special license from the crown. The first

---

**2.** Over three hundred and fifty years ago, John Milton wrote:

> Truth and Understanding are not such wares as to be monopolized and traded in by tickets, and statutes, and standards. We must not think to mark and license it like our broadcloth and our woolpacks.

J. Milton, *Areopagitica, For the Liberty of Unlicensed Printing* (London 1644).

newspapers were also met by licensing prosecutions of unlicensed news-sheet printers and the power of the crown to grant privileges of monopoly. *See* F. Siebert, *Freedom of the Press in England 1476–1776* (1965); *see also*, 2 J. Story, *Commentaries on the Constitution of the United States, § 1882* (5th ed. 1891).

The licensing of books and newspapers expired in England in 1694. However, in 1712, Parliament imposed a tax upon newspapers and advertisements. In 1765, stamps sent to the colonies for newspaper duties were a precipitating factor for the American revolution. *See Grosjean,* 297 U.S. at 246–48, 56 S.Ct. 444, 80 L.Ed. at 666–68.

When the Constitution was proposed without an explicit guarantee of freedom of the press, the antifederalists objected. Richard Henry Lee, one of Virginia's leading anti-Federalists, had been a signer of the Declaration of Independence and president of the Continental Congress. Within a month after adjournment of the Constitutional Convention, he published what quickly became the most popular and influential anti-ratificationist tract, *Letters from the Federal Farmer.* Subsequently, he published *An Additional Number of Letters,* which included a discussion of freedom of the press:

> All parties apparently agree, that the freedom of the press is a fundamental right, and ought not to be restrained by any taxes, duties, or in any manner whatever. Why should not the people, in adopting a federal constitution, declare this, even if there are only doubts about it ... Printing, like all other business, must cease when taxed beyond its profits; and it appears to me, that a power to tax the press at discretion, is a power to destroy or restrain the freedom of it. There may be other powers given, in the exercise of which this freedom may be effected; and certainly it is of too much importance to be left thus liable to be taxed, and constantly to constructions and inferences. A free press is the channel of communication as to mercantile and public affairs; by means of it the people in large countries ascertain each others sentiments; are enabled to unite, and become formidable to those rulers who adopt improper measures.

Richard Henry Lee, "Letter XVI, January 20, 1788," in *An Additional Number of Letters from the Federal Farmer to the Republican* 151–53 (Chicago: Quadrangle Books, 1962) (1788); *see also* Leonard W. Levy, *Freedom of the Press from Zenger to Jefferson* 142–44 (Carolina Academic Press, 1996). Concerns voiced by the anti-Federalists led to the adoption of the Bill of Rights, including the First Amendment, in 1791.[3]

History tells us that governments, democracies as well as monarchies, have been quick to exercise control over new technology for expression, from the printing press to broadcast television, to cable. Regulation has been directed not only at the content of the message, but at the method of its delivery. The founders of the nation who wrote the Constitution and insisted it include the First Amendment had immediate experience as a guide. Further, the First Amendment, as they wrote it, leaves no room for equivocation. "Congress shall make no law ... abridging the freedom of speech or of the press ...." In encountering new media technologies of our own era, it would be wise to remember the history of the First Amendment as well as the old adage that "those who cannot remember the past are condemned to repeat it." I George Santayana, *The Life of Reason [1905–1906], Reason in Common Sense.*

---

**3.** There is only limited evidence of exactly how the framers intended the First Amendment to apply. There are no recorded debates in the Senate, or in the States, and discussion in the House of Representatives was couched in general terms, 4 Rotunda and Nowak, *Treatise on Constitutional Law Substance and Procedure,* at 248 (3d. ed.1999).

### F.

■ In *Turner I,* the Supreme Court held that cable operators are generally entitled to the same First Amendment protection as the print media. The standard adopted by the Court in *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), which was grounded on the scarcity of broadcasting frequencies, was held inapplicable to cable. *See Turner I,* 512 U.S. at 637, 114 S.Ct. at 2456. "[T]he rationale for applying a less rigorous standard of First Amendment scrutiny to broadcast regulation ... does not apply in the context of cable regulation". *Id.* at 639, 114 S.Ct. at 2457. "[A]pplication of the more relaxed standard of scrutiny adopted in *Red Lion* and the other broadcast cases is inapt when determining the First Amendment validity of cable regulation." *Id.*

Nevertheless, in *Turner I,* the Court upheld the must-carry provisions adopted by the FCC which require carriage of local broadcast stations on cable systems. The Court determined that the applicable standard to evaluate the must-carry provisions was the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech. However, the reasons given by the Court for applying intermediate rather than strict scrutiny do not apply in this case.

First, unlike the must-carry rules which applied to virtually all cable operators in the country, the Broward County ordinance applies only to the select few that seek to operate broadband Internet service. This ordinance is targeted only at the Plaintiffs, and it is likely to result in the elimination of broadband cable Internet service in unincorporated Broward County. The ordinance was adopted at the behest of a telephone company seeking to eliminate or hamper a competitor.

Moreover, differential treatment is not justified by some special characteristic of the medium being regulated. In *Turner I,* the Supreme Court found that when an individual subscribes to cable, the physical connection between the television set and the cable network gives the cable operator bottleneck or gatekeeper control over most (if not all) of the television programming that is channeled into the subscriber's home. 512 U.S. at 656, 114 S.Ct. at 2466. According to the Court, cable operators possessed "bottleneck monopoly" power that threatened the "viability of broadcast television." *Id.* at 661, 114 S.Ct. at 2468. This was the reason the Court found *Tornillo* not to control the must-carry provisions.

Cable operators control no bottleneck monopoly over access to the Internet. Today, most customers reach the Internet by telephone. Those who obtain access through cable can use the Internet to reach any Internet information provider. After inquiry, the FCC has concluded that it does not foresee monopoly, or even duopoly in broadband Internet services. *See Advanced Services Report.* The "bottleneck" theory offers no justification for less than heightened scrutiny of the Broward County ordinance.

Finally, the Court found that the must-carry regulations did not force the cable operators to alter their own message or create a risk that a cable viewer might assume that ideas or messages of the broadcaster were endorsed by the cable operator. The Court pointed out that cable had a long history of serving as a conduit for broadcast signals and that broadcasters were required by FCC regulation to identify themselves at least once every hour. The Court stated that no aspect of must-carry would cause a cable operator to avoid controversy and by so doing diminish the free flow of information and ideas. *See Turner I,* 512 U.S. at 655–56, 114 S.Ct. at 2465–66.

In contrast, there is no history of cable operators serving as a conduit for Internet service providers. During oral argument, counsel for Broward County estimated that there may be around 5,000 Internet service providers at present, and unlike

broadcasters, there is no limit on the number that might demand access. Nor is there any reason to expect that Internet information services granted access to the cable system would not be offensive to the operator and its subscribers.[4] The cable operator under the ordinance would be required to adopt technology which would allow its system to identify each subscriber's choice of Internet service provider so that equal access could be provided and accommodate the demands of the service providers, all in contravention of existing contracts. The Broward County ordinance, unlike the must-carry regulations of the FCC, threaten to diminish the free flow of information and ideas.

For these reasons, I believe this case falls within the rule of *Tornillo, Minneapolis Star and TribuneCo.*, and *Pacific Gas and Elec. Co.* and therefore strict scrutiny is required. However, if I am mistaken, the ordinance fails content-neutral scrutiny as well.

### G.

Under *U.S. v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a content-neutral regulation will be sustained if:

> [I]t furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

■ When the government defends a regulation on speech it must demonstrate that the harm it seeks to prevent is real, not merely conjectural, and that the regulation will alleviate the harm in a direct and material way. *See Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 1800–01, 123 L.Ed.2d 543 (1993). A court may not simply assume that an ordinance will advance the asserted state interests sufficiently to justify its abridgment of expressive activity. *See Preferred Communications*, 476 U.S. at 496, 106 S.Ct. at 2038. While a legislative body is entitled to substantial deference, in First Amendment cases the deference afforded to legislative findings does not foreclose independent judgment of the facts bearing on an issue of constitutional law. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978).

■ Broward County argues that its ordinance is necessary to ensure competition by providing ISP's access to the "essential facility" operated by the cable operations. *See, e.g.*, Defendant Broward County's Memorandum of Law in Support of the County's Motion for Summary Judgment at 4, 6. According to the County, its ordinance was designed to ensure "competition" and "diversity" in cable broadband Internet services, and the cable operators "are thwarting such competition and diversity by using their exclusive control over the cable 'pipeline' ...." Defendant Broward County's Reply to Plaintiffs' Memoranda of Law at 23.

However, the harm the ordinance is purported to address appears to be non-existent. Cable possesses no monopoly power with respect to Internet access. Most Americans now obtain Internet access through use of the telephone. Local telephone companies provide dial up Internet access to over 46.5 million customers, whereas all cable companies combined cur-

---

**4.** For example, the Internet is becoming a primary platform by which white supremacist groups and other purveyors of hate such as the White Aryan Resistance and the World Church of the Creator reach out to their small but dangerous constituency. The Southern Poverty Law Center estimates there are 350 to 500 hate sites on the Internet, some offering multi-page content with audio and video. To these groups, the Internet offers a place without governance or accountability. *See,* HATE.com, Extremists on the Internet, an HBO documentary by HBO and the Southern Poverty Law Center (http://www.hbo.com/hate).

rently provide Internet services to only about two million customers. *See* G. Arlen, *11% First–Quarter Growth Lifts U.S. Online Audience to 50.27 Million Customers, 5% Use High Speech Access, Telecom Reports Int'l* (April 2000) (available at www.tr.com). The FCC has predicted that traditional telephone lines "will remain the principal means of accessing the Internet" in the near term. *Broadband Today* at 23. AOL, the most dominant ISP with over 24 million subscribers, and other predominantly dial-up ISPs have more than 90% of residential Internet users as customers. *See id.* at 32.

With respect to advanced telecommunications capability or broadband, the FCC estimated that there were approximately one million subscribers as of December 31, 1999. Of these, approximately 875,000 subscribed to cable based services, 115,000 subscribed to asymmetric DSL, with the remaining attributed to other media. Since late 1998, cable increased subscribers approximately three-fold and local telephone companies increased their DSL subscribership approximately four-fold. *See* FCC News Release: *FCC Issues Report on the Availability of High–Speed and Advanced Telecommunications Services,* 2000 FCC Lexis 4041 (Aug. 3, 2000).

The FCC, the agency charged by Congress with the responsibility of monitoring the deployment of broadband technology, has concluded that the preconditions for monopoly in the consumer market for broadband appear absent. According to the FCC, there are, or likely will soon be, a large number of potential entrants into the residential market using different technologies such as DSL, cable modems, and utility fiber to the home, satellite, and radio. The FCC does not foresee the consumer market for broadband becoming a sustained monopoly or duopoly. *See Advanced Services Report* at § 48, 52.

In contrast to the FCC, Broward County has conducted no inquiry. The County has proffered no substantial evidence demonstrating that actual harm exists that could justify infringement of First Amendment interests. "[T]he mere assertion of a dysfunction or failure in a speech market, without more is not sufficient to shield a speech regulation from the First Amendment . . . ." *Turner I,* 512 U.S. at 640, 114 S.Ct. at 2458. It has not been demonstrated that the Broward County ordinance furthers a substantial governmental interest. Therefore, even applying content-neutral intermediate scrutiny, the ordinance violates the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED and ADJUDGED that the cross-motions for summary judgment filed by Plaintiffs Comcast Cablevision of Broward County, Inc., Advanced Cable Communications, TCI TKR of South Florida, Inc. and MediaOne of Greater Florida, Inc. **(DE 103 and DE 108)** are **GRANTED**. The Motion for Summary Judgment filed by Defendant Broward County, Florida **(DE 90)** is **DENIED**. Since Ordinance No. 199–41 violates the First Amendment, it is unconstitutional and cannot be enforced. Final Judgment shall be entered in favor of the Plaintiffs.